TRANSPORTATION INSURANCE
COMPANY, Petitioner,

v.

**Juan Carlos MORIEL, Respondent.**

No. D–1507.

Supreme Court of Texas.

June 8, 1994.

Rehearing Overruled June 8, 1994.

Thomas S. Leatherbury, Vinson & Elkins, Cynthia Keely Timms, Locke Purnell Rain & Harrell, Dallas, Victor F. Poulos, Mayfield & Perrenot, El Paso, Peter G. Thompson, Charles I. Hadden, Ross Dixon & Masback, Washington, DC, for petitioner.

C.R. Kit Bramblett, Coll Bramblett, Bramblett & Bramblett, El Paso, for respondent.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HIGHTOWER, HECHT, ENOCH and SPECTOR, Justices, join.

Respondent's Motion for Rehearing is overruled. We withdraw our prior opinion and substitute the following in its place.

This case requires us to clarify the standards governing the imposition of punitive damages in the context of bad faith insurance litigation. The parties have asked us to address three issues. First, in a bad faith case, how should Texas courts apply the definition of gross negligence from *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981), to determine whether punitive damages are appropriate? Second, what constitutes legally sufficient evidence of gross negligence to support an award of punitive damages? Third, what limits do the Due Process clause of the Fourteenth Amendment to the United States Constitution and the Due Course clause of the Texas Constitution, TEX. CONST. art. 1, § 19, place on punitive damages?[1] We hold

---

1. The manner and extent to which due process requires procedural safeguards and substantive limits on punitive damages is a matter of continuing controversy throughout the United States. We note that the United States Supreme Court has granted certiorari on this issue frequently in recent years, but has given lower courts no bright-line guidance. *See Browning-* *Ferris Indus., Inc. v. Kelco Disposal, Inc.,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *TXO Prod. Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The Court has recently granted certiorari again on this important issue. *See Oberg v.*

that Juan Moriel did not present legally sufficient evidence of gross negligence. Therefore, Moriel is not entitled to punitive damages. It necessarily follows that the constitutional issues—whether the size of the punitive damages award or the procedures the trial court followed violated Transportation's due process rights—are questions that must await another day. *City of San Antonio v. Schautteet*, 706 S.W.2d 103, 105 (Tex.1986) (per curiam) (explaining that constitutional challenges should not be addressed when a case may be decided on nonconstitutional grounds). Because the court has not previously addressed punitive damages in the bad faith context, and because this opinion represents a substantial clarification of the gross negligence standard that will apply in all cases, we remand this case for a new trial in the interest of justice.

# I

On March 15, 1986, Juan Moriel, an employee of Cashway Building Materials in El Paso, was injured when a stack of countertops fell on him. Moriel suffered three broken ribs, a broken wrist, and a fractured pelvis. As a result, he was hospitalized for twelve days. His hospitalization costs were paid by Cashway's workers' compensation carrier, Transportation Insurance Company.

A few days after leaving Providence hospital, Moriel experienced periodic loss of movement in one leg. He returned to Providence to undergo tests for possible nerve damage, but the record does not reveal the results of those tests. Six weeks after the accident, Moriel attempted to resume sexual relations with his wife but discovered he was impotent. He had never before experienced this problem.

Moriel's orthopedist, Dr. Toni Ghiselli, referred him to Dr. Abel Garduno, a urologist.

Dr. Garduno ordered tests for Moriel at Pathlab in El Paso. The Pathlab tests, however, revealed no physical cause for his complaint. Dr. Garduno prescribed hormones, but these were no help. Dr. Garduno then referred Moriel to Dr. Gonzalo Diaz at the Sun Towers Sleep Disorder Center in El Paso for further testing. An equipment failure rendered the Sun Towers tests inconclusive and precluded further testing for "months." Therefore, Dr. Diaz recommended that Moriel undergo testing at the Baylor College of Medicine Sleep Disorders and Research Center in Houston.

On August 9, 1986, Moriel asked Less Huss, the adjustor handling his workers' compensation claim, to authorize payment for the Baylor tests in Houston. Huss was an employee of Crawford & Company, an independent adjusting company that handled claims for Transportation. According to Moriel's testimony, Huss required Moriel to obtain an authorization letter from Dr. Ghiselli, which Moriel did within two or three days. Huss then instructed Moriel that he would need a letter from his urologist, Dr. Garduno. Moriel complied with this request within three days. According to Moriel, Huss then instructed him to obtain yet another letter from Dr. Diaz. Moriel again complied. Huss then indicated that he could not personally authorize the Baylor tests, but that he needed approval from his superiors at Transportation's Dallas offices.

On September 10, 1986, Transportation told Moriel's attorney that it would cover the tests but not Moriel's travel expenses to Houston. Moriel's attorney accepted the proposal the same day. Moriel testified that the month that had elapsed between his request and Transportation's approval forced him to reschedule the tests. After a ten-day

---

*Honda Motor Co.*, 316 Or. 263, 851 P.2d 1084 (1993), *cert. granted*, ⸺ U.S. ⸺, 114 S.Ct. 751, 127 L.Ed.2d 69 (1994). State supreme courts and legislatures have adopted a variety of measures to regulate the frequency and magnitude of punitive damages awards, including absolute caps on punitive awards or maximum ratios with respect to actual damages, *see, e.g.*, Tex.Civ.Prac. & Rem.Code § 41.007 (Vernon Supp.1994), bifurcated trials upon proper motion, *see Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 329–32

(Tex.1993) (Gonzalez, J., concurring), or elevated burdens of proof such as "beyond a reasonable doubt," or "clear and convincing evidence." *See Haslip*, 499 U.S. at 23 n. 11, 111 S.Ct. at 1046 n. 11. Many states following *Haslip* have required detailed jury instructions explaining the factors governing the size of punitive damages awards. *See generally Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981); *Haslip*, 499 U.S. at 28–30, 111 S.Ct. at 1048–50 (upholding award based on Alabama list of governing factors).

delay, Moriel underwent testing in Houston on September 25–27. The results of the testing at Baylor indicated that Moriel's impotence problem was at least partially physical. Although no specific treatment for the physical problem was indicated, the Baylor report recommended that Moriel obtain counseling for emotional problems, for which Dr. Garduno referred Moriel to a psychiatrist, Dr. Oscar Perez. Moriel testified that he personally delivered a copy of the Baylor report to Huss, and obtained Huss's authorization for Perez's treatment.

Dr. Perez treated Moriel until April 1987. At trial, Dr. Perez testified that Moriel's impotence had both physical and mental components, and that Moriel was able to overcome the mental component through therapy and resume sexual relations with his wife.

The $3,155.00 bill for Moriel's Baylor tests was presented to Transportation on November 4, 1986. Although Transportation authorized the testing in advance, it delayed payment of this bill for more than two years. Transportation claimed that it initially delayed payment because no medical report accompanied the bill, but Moriel testified that he personally delivered the report to Huss shortly after the tests were completed. Even after the date Transportation conceded receiving the report, though, it continued to deny payment on the ground that Moriel's impotence was unrelated to his on-the-job injury.

Transportation also received bills for Dr. Perez's services totalling $2,075.00, but delayed paying them for more than a year on the ground that it had never received his medical report. Yet Perez testified that he had sent a detailed report promptly at the conclusion of Moriel's treatment.

Transportation also delayed paying a $382.25 bill from Providence Hospital for follow-up outpatient tests. Huss's correspondence indicates he sent the bill to Transportation along with the other Providence bills, which totalled nearly $7000.00, and that Transportation paid the other Providence bills. Transportation also paid the bill for follow-up testing in September 1987, after Providence filed a collection action against Moriel.

Finally, Transportation failed to pay the $238.20 Pathlab bill before the commencement of Moriel's lawsuit. However, the evidence reflects that Pathlab mailed the bill to the wrong address and that Transportation did not receive it before the suit was filed.

While he was being tested and treated, Moriel filed a workers' compensation claim against Transportation, securing a $30,022.77 award from the Industrial Accident Board (IAB) on July 17, 1987. After Transportation appealed that award to district court, Moriel counterclaimed for additional compensation, unpaid medical bills, and bad faith claims practices. In July 1988, Moriel and Transportation settled the workers' compensation claim, leaving the bad faith claim extant.

At the trial of the bad faith claim, the jury found that Transportation delayed paying the medical bills without a reasonable basis, that it knew or should have known that it had no reasonable basis to delay payment, and that it acted "with heedless and reckless disregard" for Moriel's rights. The jury awarded Moriel $1000.00 in actual damages, excluding mental anguish, $100,000.00 in mental anguish damages, and $1,000,000.00 in punitive damages. Moriel also obtained findings that Transportation had engaged in unfair, deceptive or misleading acts or practices prohibited by statute that caused him actual damages, including mental anguish. The trial court entered judgment on the bad faith findings, and overruled Transportation's motions for judgment notwithstanding the verdict, new trial, remittitur, and to disregard the jury findings.

The court of appeals affirmed, 814 S.W.2d 144, with one justice dissenting, 814 S.W.2d at 151 (Koehler, J., dissenting).

## II

We must initially determine whether the settlement of Moriel's workers' compensation claim precludes his recovery of punitive damages. The agreed Partial Judgment setting forth the parties' workers' compensation settlement recited that "it [appears] to the Court that the extent of the injury and liability for compensation or medical expenses are

uncertain...." Transportation argues that this judgment recital precludes the later finding of conscious indifference on its part, and thus eliminates Moriel's right to pursue a claim for punitive damages. In support of this position, Transportation cites *Izaguirre v. Texas Employers' Ins. Ass'n,* 749 S.W.2d 550 (Tex.App.—Corpus Christi 1988, writ denied), and *Price v. Texas Employers' Ins. Ass'n,* 782 S.W.2d 938 (Tex.App.—Tyler 1989, no writ), which held that similar recitals agreed to by the claimant in settling a workers' compensation claim constituted judicial admissions estopping the claimant from later asserting a bad-faith claim. *See also National Union Fire Ins. Co. v. Dominguez,* 793 S.W.2d 66 (Tex.App.—El Paso 1990), *rev'd on other grounds,* 873 S.W.2d 373 (Tex. 1994).[2]

■ While we do not disagree with these cases, they are not dispositive of Moriel's claims under the facts of this case. Moriel's workers' compensation counterclaim included a demand for additional lost wages as well as unpaid medical expenses. The Partial Judgment states only that "the *extent* of the injury and liability for compensation *or* medical expenses are uncertain...." (emphasis added). This recital indicates, at most, that Transportation's total liability was uncertain; it does not constitute an admission by Moriel or a finding by the court that Transportation's liability for each and every medical bill, or even any of the medical bills, was uncertain. Indeed, the settlement required Transportation to pay the disputed medical bills in full. Furthermore, Moriel's bad faith contentions are primarily related to Transportation's bad faith *delay* in paying Moriel's medical bills. The recital in the Partial Judgment is therefore not inconsistent with Moriel's claim that Transportation had a clear and certain duty to promptly pay at least some of the medical expenses, particularly those which Transportation authorized in advance.

Moreover, unlike the cases Transportation relies on, the Partial Judgment which Moriel approved specifically reserved his bad-faith claim as follows:

It is further ORDERED that this partial judgment does not release and discharge Plaintiff TRANSPORTATION INSURANCE COMPANY and any and all of its agents or representatives of and from any and all liability of any character arising out of claims made pursuant to allegations of bad faith, violations to the Texas Insurance Code, and Deceptive Trade Practices Act and Breach of Fiduciary Duty, as well as the manner in which TRANSPORTATION INSURANCE COMPANY failed to pay or delayed payment of the medical bills, as more fully alleged in Defendant JUAN CARLOS MORIEL'S Fifth Amended Counterclaim, Paragraphs XV through XXIV and that these claims are not subject to this partial judgment and remain pending in the above styled and numbered cause. It is further ORDERED that this partial judgment does not release and discharge Plaintiff TRANSPORTATION INSURANCE COMPANY and any and all of its agents or representatives of and from any and all liability of any character as alleged in Defendant JUAN CARLOS MORIEL'S Fifth Amended Counterclaim, Paragraph XXV as it pertains to those allegations of bad faith, violations of the Texas Insurance Code, Deceptive Trade Practices Act and Breach of Fiduciary Duty, as well as the manner in which TRANSPORTATION INSURANCE COMPANY either failed to pay or delayed payment of the medical bills.

Transportation concedes this point, stating in its brief that "[b]ecause ... Moriel preserved his right to sue Transportation for bad faith, [Transportation] does not argue that the agreement and judgment preclude such a cause of action." Transportation thus asserts its estoppel argument only as to the conscious indifference finding underlying the punitive damage award. But it appears that Moriel likewise preserved the punitive damages claim. The reservation in the Partial Judgment extends to "any and all liability of any character arising out of claims made

---

**2.** Transportation also cites *Torchia v. Aetna Casualty & Sur. Co.,* 804 S.W.2d 219 (Tex.App.—El Paso 1991, writ denied). In that case, however, the claimant's bad-faith cause of action was expressly included in the parties' settlement agreement.

pursuant to allegations of bad faith ... as well as the manner in which [Transportation] failed to pay or delayed payment of the medical bills...."[3] This specific reservation of Moriel's bad-faith and punitive damages claim, combined with the fact that Moriel's bad faith complaints primarily arise out of Transportation's *delay* in paying the medical bills in dispute rather than the *extent* of his injuries, controls over the more general recital that Transportation's liability was "uncertain." *See O'Connor v. O'Connor,* 694 S.W.2d 152, 155 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.).

Accordingly we hold, under the facts of this case, that the recital in the Partial Judgment concerning Transportation's uncertain liability does not preclude Moriel's claim for punitive damages.

## III

### A. The Exceptional Nature of Punitive Damages

The typical remedy in a civil case is an award of money damages sufficient to compensate the injured plaintiff. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985); *Reaugh v. McCollum Exploration Co.,* 139 Tex. 485, 163 S.W.2d 620, 621 (1942). Compensatory damages are intended to make the plaintiff "whole" for any losses resulting from the defendant's interference with the plaintiff's rights.[4] *Cavnar,* 696 S.W.2d at 552; W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF

TORTS §§ 1, 4 (5th ed. 1984) [hereinafter PROSSER & KEETON].

Punitive damages have an altogether different purpose. *Cavnar,* 696 S.W.2d at 555; *Smith v. Sherwood,* 2 Tex. 460, 463–64 (1847). "The idea of punishment, or of discouraging other offenses usually does not enter into tort law.... In one rather anomalous respect, [punitive damages], the ideas underlying the criminal law have invaded the field of torts." PROSSER & KEETON § 2. More than 100 years ago, in one of its first opinions addressing punitive damages, this court recognized the close connection between punitive damages and the criminal law:

> Such indifference is morally criminal, and if it leads to actual injury may well be regarded as criminal in law. A mere act of omission or non-feasance, to be punishable by exemplary damages, should reach the border-line of a quasi-criminal act of commission or malfeasance.

*Southern Cotton Press & Mfg. Co. v. Bradley,* 52 Tex. 587, 600–601 (1880) (citations omitted).

Punitive (or exemplary) damages are levied against a defendant to punish the defendant for outrageous, malicious, or otherwise morally culpable conduct. *Id.;* TEX.CIV. PRAC. & REM.CODE ANN. § 41.001(3) (Vernon Supp.1994) (defining "exemplary damages" as "any damages awarded as an example to others, as a penalty, or by way of punishment"). The legal justification for punitive damages is similar to that for criminal punishment,[5] and like criminal punishment, puni-

---

**3.** The reservation, which is quoted in full above, refers to specific paragraphs of Moriel's Fifth Amended Counterclaim, which is not in the appellate record. Transportation does not contend, however, that Moriel's claim for punitive damages falls outside of the referenced paragraphs.

**4.** "Contract liability is imposed by the law for ... a single limited interest, that of having contracts performed. Quasi-contractual liability is created for the prevention of unjust enrichment. The criminal law is concerned with the protection ... of the public at large.... There remains a body of law which is directed toward the compensation of individuals, rather than the public, for losses they have suffered within the scope of their legally recognized interests generally ... where the law considers that compensation is required. This is the law of torts.... The purpose of the law of torts is to adjust these losses,

and to afford *compensation* for injuries sustained as a result of the conduct of another." W. PAGE KEETON, ET. AL., PROSSER AND KEETON ON THE LAW OF TORTS § 1, at 5–6 (5th ed. 1984) (emphasis added).

**5.** The traditional justifications for criminal punishment include (1) rehabilitation of the defendant, WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 1.5(a)(3) (West ed. 1986), (2) disabling, *id.* at § 1.5(a)(2), or deterring, *id.* at § 1.5(a)(1), the defendant from committing further crime, (3) deterring persons other than the defendant from crime, *id.* at § 1.5(a)(4), (5), (4) desert or retribution—punishing the defendant because he or she deserves to be punished, *id.* at § 1.5(a)(6), and (5) vengeance—satisfying the urge of the community to return to the defendant the injury done. OLIVER W. HOLMES, JR., THE COMMON LAW 40–41 (1881).

tive damages require appropriate substantive and procedural safeguards to minimize the risk of unjust punishment.

Although punitive damages are levied for the public purpose of punishment and deterrence,[6] the proceeds become a private windfall.[7] *See* 26 U.S.C. §§ 104, 104(a)(2) (excluding personal injury compensatory damages but not punitive damages from income for tax purposes); *Commissioner v. Miller,* 914 F.2d 586, 591 (4th Cir.1990) (explaining that punitive damages, unlike personal injury damages, are not excludable from income because "[s]uch damages are a windfall ... over and above any award of compensatory damages"). In contrast, criminal fines are paid to a governmental entity and used for a public benefit. Our duty in civil cases, then, like the duty of criminal courts, is to ensure that defendants who deserve to be punished in fact receive an appropriate level of punishment, while at the same time preventing punishment that is excessive or otherwise erroneous.

### B. Bad Faith Insurance Disputes

■ Defining the substantive standard for punitive damages in the context of a bad faith insurance dispute requires an examination of the relationship of a claim for punitive damages to the underlying claims for breach of contract and bad faith. Our law recognizes a three-tier framework for measuring damages in an insurance coverage dispute, and each level is associated with distinctly different policies, substantive definitions, and measures of proof. A bad faith case can potentially result in three types of damages: (1) benefit of the bargain damages for an accompanying breach of contract claim, (2) compensatory damages for the tort of bad faith, and (3) punitive damages for intentional, malicious, fraudulent, or grossly negligent conduct. It is important to preserve distinct legal boundaries between the three bases of

recovery to prevent arbitrariness and confusion at the critical thresholds. *See, e.g., Lyons v. Millers Casualty Ins. Co.,* 866 S.W.2d 597, 600 (Tex.1993) ("This focus on evidence and its relation to the elements of bad faith is necessary to maintain a distinction between a contract claim on the policy, and a claim of bad faith delay or denial.").

As we said in *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567 (Tex.1990), "[A] breach of the duty of good faith and fair dealing will give rise to a cause of action in tort that is separate from any cause of action for breach of the underlying insurance contract." The contract aspect of a coverage dispute concerns either the factual basis for the claim, the proper legal interpretation of the policy, or both. If the loss is covered, then the insurer is obligated to pay the claim according to the terms of the insurance contract. *See Crisp v. Security Nat'l Ins. Co.,* 369 S.W.2d 326, 328–29 (Tex.1963); *Klein v. Century Lloyds,* 154 Tex. 160, 275 S.W.2d 95 (1955). An insurer's nonpayment of a covered claim ordinarily is a breach of contract, and does not alone entitle a plaintiff to mental anguish, *Dean v. Dean,* 837 F.2d 1267 (5th Cir.1988) (citing *St. Elizabeth Hosp. v. Garrard,* 730 S.W.2d 649 (Tex.1987), *overruled on other grounds, Boyles v. Kerr,* 855 S.W.2d 593 (Tex.1993)), or exemplary damages. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617 (Tex.1986).

■ The threshold of bad faith is reached when a breach of contract is accompanied by an independent tort. Evidence that merely shows a bona fide dispute about the insurer's liability on the contract does not rise to the level of bad faith. *National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376–77 (Tex.1994); *National Union Fire Ins. Co. v. Hudson Energy Co.,* 780 S.W.2d 417, 426 (Tex.App.—Texarkana 1989), *aff'd,*

---

6. "Unlike compensatory damages, which are purely civil in character, punitive damages are, by definition, punishment. They operate as ... fines levied ... to advance governmental objectives." *Haslip,* 499 U.S. at 47, 111 S.Ct. at 1058–59 (1991) (O'Connor, J., dissenting).

7. "It is generally agreed that punitive damages are a windfall to the plaintiff and not a matter of

right...." PROSSER AND KEETON § 2 at 14; *see also Haslip,* 499 U.S. at 11, 111 S.Ct. at 1040 (describing punitive damages as a "windfall") (quoting *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981) ("The impact of such a *windfall* recovery is likely to be both unpredictable and, at times, substantial.") (emphasis added)).

811 S.W.2d 552 (Tex.1991).[8] Nor is bad faith established if the evidence shows the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy. *Lyons*, 866 S.W.2d at 601 ("[T]he issue in bad faith focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct in rejecting the claim."). A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith. *Id.* To the contrary, an insured claiming bad faith must prove that the insurer had no reasonable basis for denying or delaying payment of the claim, and that it knew or should have known that fact. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987); *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 213 (Tex.1988).

▪ The final critical threshold is that separating the tort of bad faith from conduct subject to punishment. Even if the insurer has "no reasonable basis" to deny or delay payment of the claim, the plaintiff may not recover punitive damages on that basis alone. *Arnold*, 725 S.W.2d at 168 ("the same principles allowing recovery of [punitive] damages in other tort actions" apply with respect to bad faith) (citing *Ware v. Paxton*, 359 S.W.2d 897, 899 (Tex.1962) ("The fact that an act is [tortious] is not of itself ground for an award of exemplary or punitive damages.") (quoting *Jones v. Ross*, 141 Tex. 415, 173 S.W.2d 1022, 1024 (1943) (quoting 25 C.J.S. *Damages* § 123 at 726 (1966)))). The bad faith of the insurer justifies an award of compensatory damages and nothing more. Only when accompanied by malicious, intentional, fraudulent, or grossly negligent conduct does bad faith justify punitive damages. *Id.*

It is as important to maintain the distinction between punishment and compensation in the context of bad faith as it is in the remainder of tort law. The reason the law of torts recognizes compensation, rather than punishment, as its paramount objective is that civil punishment can result in overdeterrence and overcompensation. Every tort involves conduct that the law considers wrong, but punitive damages are proper only in the most exceptional cases. Unless bad faith is accompanied by aggravated conduct by the insurer, then compensatory damages alone are the proper remedy.

The particular difficulty at this threshold is to articulate the distinction between simple and aggravated bad faith in a manner that judges and juries may accurately and fairly apply. In a helpful effort to draw this distinction the Arizona Supreme Court has observed:

Such damages are recoverable in bad faith tort actions when, *and only when*, the facts establish that the defendant's conduct was aggravated, outrageous, malicious or fraudulent. Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule. The difference is no doubt harder to articulate in legalistic terms than it is to differentiate on the facts. To obtain tort damages, for instance, the plaintiff must prove only that the defendant . . . [acted without] the reasonable basis required for denying the claim. To obtain punitive damages, plaintiff must also show that the evil hand that unjustifiably damaged the objectives . . . [of] the insurance contract was guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was

8. It is not apparent why JUSTICE DOGGETT mischaracterizes *Hudson Energy* as a means of "free[ing] from responsibility" insurers that "willfully . . . [delay] or den[y] coverage with no reasonable basis," or as creating "a perverse incentive for insurers to manufacture . . . coverage disputes" for the purpose of delay. 879 S.W.2d 10, 36. By definition, such insurers are guilty of bad faith. *Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210 (Tex.1988). What he calls "the bona fide dispute rule" is nothing more than a shorthand notation for the observation

that the parties to an insurance contract will sometimes have a good faith disagreement about coverage. Under such circumstances, the parties may require a court to interpret policy language for them, or a jury to resolve factual disputes. Simply because the parties go to court does not raise an issue of the insurer's bad faith. We do agree with JUSTICE DOGGETT, however, when he says that "[C]laims for insurance contract coverage are distinct from those in tort for bad faith; resolution of one does not determine the other." 879 S.W.2d at 40.

likely to cause unjustified, significant damage to the insured.

*Rawlings v. Apodaca,* 151 Ariz. 149, 726 P.2d 565, 578 (1986) (emphasis in original) (citations omitted). Likewise, the Alabama Supreme Court in *Continental Assur. Co. v. Kountz,* 461 So.2d 802 (Ala.1984), developed a two-part standard for punitive damages in a bad faith insurance dispute. The *Kountz* court held that before punishment is justified, an insurer (1) must have intentionally breached the duty of good faith and fair dealing, and (2) must additionally have engaged in conduct that involved "malice, willfulness or wanton and reckless disregard of the rights of others." *Id.* at 808–09.

■ There is not yet any uniformity among states concerning the proper test for punitive damages in a bad faith case. *See* JOHN C. MCCARTHY, RECOVERY OF DAMAGES FOR BAD FAITH § 1.60 (1990). However, a review of relevant cases in a number of jurisdictions reveals two core requirements: (1) the insurance carrier must act on the basis of an aggravated mental state, such as intent, recklessness, or gross negligence, that involves either deliberate and purposeful injury to the insured or actual subjective awareness that serious injury is highly probable, and (2) this intended or probable injury must be independent and qualitatively different from the breach of contract and the compensable harms associated with it. *See Kountz,* 461 So.2d 802; *Rawlings,* 726 P.2d 565; *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 723 P.2d 675 (1986) (en banc); *Borland v. Safeco Ins. Co.,* 147 Ariz. 195, 709 P.2d 552 (Ct.App.1985); *Weisman v. Blue Shield of Cal.,* 163 Cal.App.3d 61, 209 Cal.Rptr. 169, 173–74 (1984); *Newton v. Standard Fire Ins. Co.,* 291 N.C. 105, 229 S.E.2d 297, 302 (1976); *Shimola v. Nationwide Ins. Co.,* 25 Ohio St.3d 84, 495 N.E.2d 391, 393 (1986) (per curiam); *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 378–79 (1978); *Guarantee Abstract & Title Co. v. Interstate Fire & Casualty Co.,* 232 Kan. 76,

652 P.2d 665, 668 (1982). We believe the general thrust of these cases is essentially correct.[9] However, no jurisdiction has a gross negligence standard or bad faith jurisprudence identical to those of Texas. Moreover, none of these jurisdictions has addressed the critical distinctions in a manner we find completely satisfactory. Therefore, the duty falls on this court to add our refinements to these earlier analyses in a manner that meshes properly with the rest of Texas law.

## IV

Three steps are required to analyze whether the evidence in this case is legally sufficient to support punitive damages. The first is to examine our traditional definition of gross negligence and identify its basic elements. The second is to determine how these elements should be applied in the context of a bad faith insurance coverage dispute. Only then can we reach step three and determine meaningfully whether legally sufficient evidence supports the verdict.

### A.

#### 1. The Definition of Gross Negligence

■ In *Burk Royalty,* 616 S.W.2d at 920, we analyzed the history of gross negligence evidentiary review in Texas at length and determined that "all roads" lead to the following definition of gross negligence:

> Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

This definition is taken verbatim from *Missouri Pac. Ry. v. Shuford,* 72 Tex. 165, 171, 10 S.W. 408, 411 (1888), and is little changed since this court first defined gross negligence in *Southern Cotton Press,* 52 Tex. 587 (1880)

---

9. We disagree with JUSTICE DOGGETT'S reading of the authorities cited. 879 S.W.2d at 40, n. 16, n. 17, n. 18. In determining whether contract damages alone will support punitive damages against a breaching insurer, each of these jurisdictions adopts a "separate injury" rationale

as opposed to a "same injury" rule. Although not all of these jurisdictions recognize the tort of bad faith, each decision is relevant because each uses similar standards to govern punitive damages in this context.

("that entire want of care which would raise a presumption of conscious indifference to consequences"). In 1987, however, the legislature modified the common law definition:

> "Gross negligence" *means more than momentary thoughtlessness, inadvertence or error of judgment*. It means *such an* entire want of care *as to establish* that the act or omission was the result of *actual* conscious indifference to the rights, *safety*, or welfare of the person affected.[10]

Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1994) (emphasis added). The statutory definition of gross negligence, when compared with the common law definition, emphasizes that the evidence must "establish" the defendant's *actual* conscious indifference, rather than raise the mere belief that conscious indifference might be attributable to a hypothetical reasonable defendant.[11] John T. Montford & Will G. Barber, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System*, 25 Hous.L.Rev. 245, 323–24 (1988). Because the Tort Reform Act codified the common law definition and made no change affecting the basic elements of gross negligence, Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex.Gen.Laws 44 (*codified as* Tex.Civ.Prac. & Rem.Code Ann.

§ 41.001(5)), the language defining gross negligence to be applied in a particular case should not turn on the applicability of the Act.

Our cases before *Burk Royalty* tended to focus only on one portion of the *Shuford* definition, "entire want of care," and reasoned that any defendant who exercised "some care" could not be grossly negligent. *Burk Royalty*, 616 S.W.2d at 918 (citing *Sheffield Div., Armco Steel Corp. v. Jones*, 376 S.W.2d 825 (Tex.1964)). *Burk Royalty* cautioned, however, that "entire want of care" must be "understood in the context of the whole [definition]," and correctly instructed reviewing courts to look for evidence of the defendant's subjective mental state rather than the defendant's exercise of care. *Id.* at 922 ("What lifts *ordinary* negligence into *gross* negligence is the mental attitude of the defendant").

Although *Burk Royalty* exhorted a reviewing court to look to "all of the surrounding facts," our usual process of "no evidence" review constrains us to look only to the evidence that favors the verdict. *Garza v. Alviar*, 395 S.W.2d 821, 824 (Tex.1965), *cited in Burk Royalty*, 616 S.W.2d at 922. Applying traditional legal sufficiency review since *Burk Royalty*, we have consistently disre-

---

**10.** Consistent with our earlier observations about the quasi-criminal nature of punitive damages, it is noteworthy that the civil standard for gross negligence bears a remarkable resemblance to the statutory definition of criminal recklessness:

> A person acts recklessly, or is reckless ... when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

Tex.Penal Code Ann. § 6.03(c) (Vernon 1974). This definition was adopted from the American Law Institute Model Penal Code. Under the Model Penal Code, both criminal negligence and criminal recklessness require extremely risky behavior:

> A person acts with criminal negligence ... when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person

would exercise under all the circumstances as viewed from the actor's standpoint.

Tex.Penal Code Ann. § 6.03(d) (Vernon 1974). Criminal negligence and recklessness differ from one another only in terms of mental state. A criminally negligent defendant "ought to be aware" of a "substantial and unjustifiable" risk, while a reckless defendant is subjectively aware of an identical risk but disregards it. Importantly, *nobody* is subject to criminal punishment if they are aware of a relatively minor risk or simply negligent.

It should not be surprising that the civil definition of gross negligence and the criminal definition of recklessness are virtually identical. Both serve the same purpose—identifying when it is appropriate to punish an individual for consciously disregarding an unjustifiable risk.

**11.** This statutory change was prompted, in part, by a 1985 case that suggested that common law gross negligence may be established by reference to a purely objective standard—what "a reasonable person would have realized" under the same or similar circumstances. *See Williams v. Steves Indus. Inc.*, 699 S.W.2d 570, 573 (Tex. 1985).

garded facts that tend to contradict the verdict. *General Chem. Corp. v. De La Lastra,* 852 S.W.2d 916, 921 (Tex.1993), *cert. dismissed,* —— U.S. ——, 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); *Williams v. Steves Indus., Inc.,* 699 S.W.2d 570, 574 (Tex.1985); *International Armament Corp. v. King,* 686 S.W.2d 595, 597 (Tex.1985); *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983); *Neely v. Community Properties, Inc.,* 639 S.W.2d 452, 454 (Tex.1982).

Unfortunately, other aspects of *Burk Royalty* caused the courts to have difficulty applying the appropriate standard of review in gross negligence cases. First, *Burk Royalty* admonished courts to concentrate on the defendant's mental state, *Burk Royalty,* 616 S.W.2d at 922, but offered no other ground to distinguish gross from ordinary negligence.[12] Second, *Burk Royalty* correctly permitted an inference of subjective awareness from surrounding circumstances. *Id.* As a result, our usual "no evidence" review process, when applied to the *Burk Royalty* analysis of gross negligence eroded the distinction between gross and ordinary negligence. If evidence of carelessness could support a finding of negligence, then the evidence viewed in its most favorable light would often support a circumstantial inference of subjective awareness as well. *Id.* Because subjective awareness was the only ground the court identified to separate gross from ordinary negligence, *id.,* the *Burk Royalty* analysis readily permitted an inference of gross negligence from evidence of "some" carelessness. *See, e.g., General Chem. Corp.,* 852 S.W.2d at 921 (holding chemical manufacturer grossly negligent for failure to include word "death" in extensive warning label based on evidence of manufacturer's awareness of incident involving misuse of unlabelled product 15 years earlier); *but see Wal–Mart Stores, Inc. v. Alexander,* 868 S.W.2d 322 (Tex.1993) (expressly distinguishing between legally sufficient evidence of negligence and legally sufficient evidence of gross negligence). In this way, *Burk Royalty* established a "some carelessness" standard of legal sufficiency review that was as favorable to punitive damage awards as the earlier· "some care" test had been hostile to them.

### 2. Toward a Functional Interpretation

"Some carelessness" review invariably confuses two very different things: (1) some evidence of carelessness, and (2) legally sufficient evidence that the defendant was consciously indifferent to the rights, safety, or welfare of others. The fundamental defect in the "some carelessness" approach is that it fails to consider the definition of gross negligence as a whole. The entire definition of "gross negligence" is "such an entire want of care as to establish that the *act or omission* was the result of actual conscious indifference to the rights, safety, or welfare of the person affected." Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1994) (emphasis added).

Gross negligence thus involves two components: (1) the defendant's act or omission, and (2) the defendant's mental state. As defined, the act or omission element must involve behavior that endangers the rights, safety, or welfare of the person affected.[13] Tex.Civ.Prac. & Rem.Code Ann. § 41.001(5) (Vernon Supp.1994). Gross negligence, then, differs from ordinary negligence with respect to both elements—the defendant must be "consciously indifferent" and his or her conduct must "create an extreme degree of risk." *Williams,* 699 S.W.2d at 573; *see also Wal–Mart,* 868 S.W.2d at 326 ("We reaffirm that a gross negligence finding may be upheld on appeal only if there is [legally sufficient] evidence that a) the defendant's conduct created an extreme risk of harm, and b) the defendant was aware of the extreme risk.").

■ As we have recently reiterated, the test for gross negligence "contains both an

---

**12.** Thus, it has been argued that under *Burk Royalty,* gross negligence is simply "a conscious decision to act negligently." . This argument eliminates the distinction between negligence and gross negligence because a jury can always infer that a person knew what he or she was doing.

**13.** *Burk Royalty* described gross negligence as involving "peril" to the injured party. *Burk Royalty,* 616 S.W.2d at 922.

objective and a subjective component." *Wal–Mart*, 868 S.W.2d at 326. Subjectively, the defendant must have actual awareness of the extreme risk created by his or her conduct. *Id.* Objectively, the defendant's conduct must involve an "extreme degree of risk," a threshold significantly higher than the objective "reasonable person" test for negligence. *Id.* Extreme risk is a function of both the magnitude and the probability of the anticipated injury to the plaintiff. As we said in *Wal–Mart*, the "extreme risk" prong is not satisfied by a remote possibility of injury or even a high probability of minor harm, but rather "the likelihood of serious injury" to the plaintiff. *Id.* at 327. (emphasis omitted).

An act or omission that is merely thoughtless, careless, or not inordinately risky cannot be grossly negligent. Only if the defendant's act or omission is unjustifiable [14] and likely to cause serious harm can it be grossly negligent.

It should not be surprising, perhaps, that many efforts to analyze gross negligence findings confuse the defendant's mental state with the nature of the defendant's act or omission. The mental state involves awareness of the risk, and thus the two are interrelated. As Prosser and Keeton point out, most jurisdictions distinguishing gross from ordinary negligence have focused on either the difference in the defendant's mental state or the difference in riskiness of the defendant's act, but the two definitions have tend-

ed to merge and "take on the same meaning, of an aggravated form of negligence...." Prosser & Keeton § 34 at 214 (5th ed. 1984), *cited in Williams*, 699 S.W.2d at 572. But this is not so in Texas. Ours is "a hybrid definition, distinctive to this state ... combin[ing] both of the traditional tests for gross negligence." *Williams*, 699 S.W.2d at 572–73.

*Williams* also suggested that gross negligence could be proved if "under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others." *Id.* at 573. This language is potentially misleading, however. It is true that the relative riskiness of the defendant's *action* can be determined by an objective "extreme risk" test, but before a gross negligence finding can be sustained the evidence must show *both* that the act was likely to result in serious harm *and* that the defendant was *consciously indifferent* to the risk of harm. *Wal–Mart*, 868 S.W.2d at 326. The requirement of conscious indifference, which our law requires, is superfluous unless it requires proof that the defendant had actual subjective knowledge of an extreme risk of serious harm. *Williams*, therefore, should *not be read to import* the objective "reasonable person" standard for ordinary negligence into the distinctly different process of determining subjective mental state in gross negligence cases.

---

14. The justification issue is essential for both courts and juries in determining whether a defendant was grossly negligent when the defendant introduces evidence of mitigating circumstances. *See, e.g., Burk Royalty*, 616 S.W.2d at 926 (Greenhill, C.J., concurring):

> For example: there is evidence that the defendant, in a non-defective car, continues to drive at 65 miles per hour into a small town. The defendant runs a red light and passes a car over the center line before there is an accident. That is "some evidence" of gross negligence. If the court only considers that evidence, it must affirm a gross negligence finding. Then the court finds that the defendant's wife and daughters, or other persons, are bleeding to death in the back seat of defendant's car; and they will die if they do not receive immediate medical attention. Will the court then use the "traditional no evidence" test to evaluate gross negligence? There may be negligence, yes.

> But is there conscious indifference to human life?
> The answer, of course, is that we *should* apply our traditional "no evidence" test. By taking an extreme risk, this hypothetical defendant greatly increased the likelihood (1) that an accident would prevent his wife and daughters from ever obtaining medical care, and (2) that additional medical attention would be required for both himself and bystanders. Jurors could nevertheless decide that the risk was excusable under the circumstances, which is their prerogative.
> Assuming that the jury decides this hypothetical defendant was grossly negligent, then this court could only reverse the verdict if the evidence in the record were legally insufficient to permit an inference that the defendant had actual subjective awareness of the risk he created. *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex.L.Rev. 515, 522–23 (1991).

Recognizing the practical difficulty of producing direct evidence of conscious indifference short of the defendant's admission, *Williams* quite reasonably stated that "the plaintiff need not prove the defendant's subjective state of mind by direct evidence," and authorized proof of this element by circumstantial evidence. *Williams,* 699 S.W.2d at 573 ("reaffirm[ing] [the] holding in *Burk Royalty,*" 616 S.W.2d at 922). We hereby reaffirm our holding that the defendant's subjective mental state can be proven by direct or circumstantial evidence.

Determining whether an act or omission involves extreme risk or peril requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. In every negligence or gross negligence case, some injury has allegedly occurred. However, the magnitude of the injury may be entirely disproportionate to the riskiness of the behavior. For example, inadvertently dropping a wooden board into the metal hold of a ship may constitute negligence, but cannot be *gross* negligence. This is so even though the board, upon landing, triggers a Rube Goldberg chain reaction, eventually causing the whole ship to explode.[15] *See In re Polemis,* [1921] 3 K.B. 560. If somebody has suffered grave injury, it may nevertheless be the case that the behavior which caused it, viewed prospectively and without the benefit of hindsight, created no great danger. In such a case, punitive damages are not appropriate. In summary, the definition of gross negligence includes two elements:

(1) viewed objectively from the standpoint of the actor, the act or omission must involve an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and (2) the actor must have actual, subjective awareness of

the risk involved, but nevertheless proceed in conscious indifference to the rights, safety, or welfare of others.

### B. Application to Bad Faith Insurance Disputes

An insurer's delay or refusal to pay an insured's claim, even when the insurer has no reasonable basis for doing so, is not gross negligence. It is bad faith. An insurer is liable for punitive damages only if the bad faith tort was accompanied by gross negligence.[16] *Aranda,* 748 S.W.2d at 215; *Arnold,* 725 S.W.2d at 168 ("the same principles allowing [the] recovery of [punitive] damages in other tort actions" apply with respect to bad faith) (citing *Ware,* 359 S.W.2d 897); *cf. Lyons,* 866 S.W.2d at 600. Although the multiple grounds of recovery in bad faith lawsuits might seem to complicate the gross negligence issue, the proper analysis is relatively simple—gross negligence in the context of insurance is *no different from gross negligence in any other context.*

In addition to conscious indifference, an insured who alleges gross negligence must prove that the insurer committed an act that was likely to cause serious injury. In essence, the issue in determining whether bad faith involved an independent likelihood of "serious injury" is whether the insurer engaged in the sort of outrageous behavior that the law seeks to punish. *Ware,* 359 S.W.2d at 899 ("The fact that an act is [tortious] is not of itself ground for an award of exemplary or punitive damages.").

It may be easier to describe "serious injury" in a bad faith case by first saying what it cannot be. It cannot be the injury associated with the breach of contract. Other jurisdictions considering this issue uniformly require some serious injury that is

---

**15.** In contrast, an act or omission that creates a great peril but results in only a minor injury may be grossly negligent. If, for example, a person fires a gun randomly into a crowd of schoolchildren, but the shooting only results in the destruction of a pair of sunglasses, the defendant would still be grossly negligent. *See TXO Prod. Corp. v. Alliance Resources Corp.,* — U.S. —, —, 113 S.Ct. 2711, 2720–21, 125 L.Ed.2d 366, 380 (1993).

**16.** A literally correct statement of the law is, "Only if gross negligence, intentional injury, fraud or malice accompany the bad faith tort are punitive damages proper." This case deals only with gross negligence, however. We therefore express no opinion on the circumstances in which an insurer's intentional misconduct will justify punitive damages.

independent and qualitatively different from the breach of the insurance contract. *Linthicum*, 723 P.2d 675; *Borland*, 709 P.2d 552; *Weisman*, 209 Cal.Rptr. at 173–74; *Newton*, 229 S.E.2d at 302; *Shimola*, 495 N.E.2d at 393; *Anderson*, 271 N.W.2d 368; *Guarantee Abstract*, 652 P.2d at 668. Nor do mere inconvenience, annoyance, or delay satisfy this requirement. Some inconvenience accompanies the breach of any contract, and is not ordinarily considered punishable, even if the breach is intentional. *Jim Walter Homes*, 711 S.W.2d at 618. Although the bad faith breach of an insurance contract, unlike the breach of most contracts, may justify an award of consequential damages for mental anguish,[17] *Arnold*, 725 S.W.2d at 168, the existence of mental anguish damages alone does not ordinarily warrant legal punishment.

Some consequential injuries may satisfy the "independent and qualitatively different" test for punitive damages. For example, if an insured requires medical treatment, yet her insurer denies coverage in bad faith with full knowledge of the danger to the insured, then the insured will probably suffer serious injury not ordinarily associated with mere breach of contract. Also, some forms of insurance, such as disability insurance, may be such that insurers frequently can expect that bad faith denial of coverage will result in such an extraordinary degree of hardship and oppression that punishment would be warranted. *See Delgado v. Heritage Life Ins. Co.*, 157 Cal.App.3d 262, 203 Cal.Rptr. 672, 680–81 (1984).

Because the fact patterns arising in insurance coverage disputes vary so widely, we must rely on the evolution of the common law to increase the precision of this distinction over time. In general, though, an insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim—such as death, grievous physical injury, or financial ruin. *See, e.g., Silberg v. California Life Ins. Co.*, 11

Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974) (holding carrier subject to punitive damages when it knew that its bad faith denial of health insurance claim for over two years caused great harm to the plaintiff, including denial of surgical treatment, inability to afford pain medication, failure of his small business, two nervous breakdowns, and repossession of plaintiff's wheelchair). The harm must be independent and qualitatively different from the sort of injuries that typically result from bad faith or breach of contract. *Jim Walter Homes*, 711 S.W.2d at 618; *Ware*, 359 S.W.2d at 899.

## V

To sustain the punitive damages awarded to Moriel in this case, the record must contain legally sufficient evidence of Transportation's gross negligence. Otherwise, we are obligated to reverse the judgment of the court below.

However, we are not simply directed to determine whether evidence exists that has some remote relation to the verdict. We must also determine whether the evidence is *legally sufficient.* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX.L.REV. 361 (1960); William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515 (1991). If the evidence is legally sufficient, we may not reverse the trial court's judgment; if it is not legally sufficient, we are compelled to do so.

"The evidence presented, viewed in the light most favorable to the prevailing party, must be such as to permit the logical inference [that the jury must reach]." *Lyons*, 866 S.W.2d at 600; *Dominguez*, 873 S.W.2d at 376. There must necessarily be a logical connection, direct or inferential, between the evidence offered and the fact to be proved. *Lyons*, 866 S.W.2d at 600 (citing *Pittman v. Baladez*, 158 Tex. 372, 312 S.W.2d 210, 216 (1958)). However, we must also bear in mind the difference between materiality of the evidence and the issue of evidentiary sufficiency. Simply because a piece or pieces of

---

17. Transportation has not challenged recovery of mental anguish damages for its bad faith or the legal sufficiency of the evidence concerning Moriel's mental anguish.

evidence are *material* in the sense that they make a "fact that is of consequence to the determination of the action more . . . or less probable," TEX.R.CIV.EVID. 401, does not render the evidence *legally sufficient*. As Professor McCormick succinctly put it, "a brick is not a wall." CHARLES T. MCCORMICK, HANDBOOK OF THE LAW OF EVIDENCE § 152 (West ed. 1954); *see also* FED.R.EVID. 401 advisory committee's note; RICHARD D. FRIEDMAN, THE ELEMENTS OF EVIDENCE 59–60 (West ed. 1991).

■ In evaluating legal sufficiency, we are required to determine whether the proffered evidence as a whole rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 522, 523 (1991) ("[T]he court must be persuaded that reasonable minds could not differ on the matter. . . . Ultimately, the test for "conclusive evidence" . . . is similar to the test for "no evidence" . . . the court asks whether reasonable minds could differ about the fact determination to be made by the jury."); Calvert, *supra* at 363–65 ("The rule as generally stated is that if reasonable minds cannot differ from the conclusion that the evidence lacks probative force it will be held to be the legal equivalent of no evidence."); *see also Litton Indus. Prods., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984); *Woods v. Townsend,* 144 Tex. 594, 192 S.W.2d 884 (1946); *Joske v. Irvine,* 91 Tex. 574, 44 S.W. 1059 (1898); *McDonough v. Zamora,* 338 S.W.2d 507, 515–16 (Tex.Civ.App.—San Antonio 1960, writ ref'd n.r.e.).

As we have previously stated, there is evidence that Transportation agreed in advance to pay for Moriel's testing but not his travel, that its process of deciding whether to pay caused a ten-day delay in testing, that it delayed for two years to pay the testing expenses and for over a year to pay subsequent treatment expenses. Transportation eventually paid only after the threat of collection efforts.[18] Transportation says it disputed coverage of the treatment expenses because it believed that Moriel's impotence was not work-related, but Transportation's reasons for delay are irrelevant because it concedes for purposes of this appeal that legally sufficient evidence supports the jury's conclusion that it acted without any reasonable basis and is thus liable for bad faith.[19]

The jury found that Transportation acted in "heedless and reckless disregard" of Moriel's rights. The jury's other findings, (1) that Transportation had no reasonable basis to delay payment, and (2) that Transportation "knew or should have known" it had no reasonable basis, only support the unchallenged award of bad faith damages. "Heedless and reckless disregard," as defined in the jury instruction, is gross negligence. *See Rowan v. Allen,* 134 Tex. 215, 134 S.W.2d 1022, 1024 (1940).

■ Under a gross negligence theory, Transportation cannot be liable for punitive damages unless it was "consciously indifferent." The question is not whether Transportation was unreasonable or whether it "should have known" it was acting in bad faith, but whether Transportation was actually aware of an extreme risk—some genuine and unjustifiable likelihood of serious harm to Moriel that was independent and qualita-

---

18. The Workers' Compensation Act makes the employee's obligation to pay medical bills secondary to that of the insurer. *Smith v. Stephenson,* 641 S.W.2d 900, 902 (Tex.1982). Moreover, it prohibits health care providers from trying to collect from the employee unless and until the IAB rules that the carrier is not responsible for payment. *Id.* at 903. Therefore, Transportation did not expose Moriel to any risk of legitimate collection efforts by his health care providers when it simply brought a dispute before the IAB. Transportation cannot be held legally accounta-

ble on the assumption that Moriel's providers would try to collect in violation of the law.

19. Less than two weeks before we issued this opinion, Transportation moved to amend its application for writ of error to challenge the legal sufficiency of the bad faith findings. This court may allow such an amendment "at any time when justice requires upon such reasonable terms as the court may prescribe." TEX.R.APP.P. 131(h). Transportation could have, but did not, raise this point of error in its original application; we have overruled its motion to amend.

tively different from the inconvenience of an unreasonable delay in payment.

The evidence presented does not support this finding. Viewed in its most favorable light, Moriel's evidence does not support either (1) the inference that Transportation had any subjective awareness that Moriel would probably suffer serious injury because of Transportation's delay, or (2) the inference that Transportation's actions created any risk of serious harm to Moriel.

The only harm that Transportation's delay caused Moriel was the anxiety of knowing that his bills were not paid until Providence Hospital filed a collection action in violation of the Workers' Compensation Act.[20] While Moriel's anxiety and embarrassment were genuine, this injury does not rise to the level of serious harm sufficient to justify punitive damages.[21] Cf. *Fidelity & Guar. Ins. Underwriters v. Saenz*, 865 S.W.2d 103, 113 (Tex. App.—Corpus Christi 1993, writ granted); *Cronin v. Bacon*, 837 S.W.2d 265, 269 (Tex. App.—Fort Worth 1992, writ denied) (defining "mental anguish").

Although the jury found that Moriel suffered substantial mental anguish, this consequential injury does not support the punitive damage award under the circumstances of this case. We cannot rule out the possibility that evidence of aggravating circumstances might, in a different case, justify punitive damages for an insurer's conscious indifference to the probability of mental anguish. However, even assuming that sufficient evidence of aggravating circumstances were in this record, Moriel has still failed to introduce any evidence whatsoever that Transportation had subjective awareness. Because Moriel alleged no other form or risk of consequential injury, and introduced no evidence of the same, Transportation's "no evidence" point must be sustained.

Ordinarily, reversal on this point of error would result in judgment in Transportation's favor on the issue of punitive damages. However, the trial was conducted at a time when no opinion of this court specifically addressed the standards governing the imposition of punitive damages in bad faith lawsuits. Moreover, today's decision represents a substantial clarification of the Texas gross negligence standard and "no evidence" review of gross negligence findings. We have broad discretion to remand for new trial in the interest of justice. Tex.R.App.P. 180; *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 23 (Tex.1993); *Boyles,. 855 S.W.2d at 603; *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 830 (Tex.1990); *Scott v. Liebman*, 404 S.W.2d 288, 294 (Tex.1966). We therefore reverse the judgment of the court of appeals and remand this case for a new trial. We are convinced that a retrial of the case, applying the standards announced today, is warranted in the interest of justice.

## VI

### Procedural Standards

Inasmuch as we are remanding this case for retrial, we consider it advisable, in the exercise of our common law duties, to articulate procedural standards for the trial court. The standards we announce apply to all punitive damage cases tried in the future. In

---

**20.** Moriel testified that he was embarrassed because Dr. Perez had not been paid for the services he rendered, causing Moriel to terminate the therapy prematurely. Thus, he testified that Transportation's failure to pay the Perez bill, at least indirectly, hindered his psychiatric treatment. However, there is no evidence in the record that this was ever communicated to Transportation.

**21.** JUSTICE DOGGETT mistakenly suggests that punitive damages are the only deterrent available at law, and that the absence of punitive damages should be taken as an indication that a tort is "not worth deterring." 879 S.W.2d at 37. We disagree. Not only does the prospect of being sued and having to defend oneself have a deterrent effect in most circumstances, but the threat of compensatory damages also serves as a deterrent, even for such "repeat-players" in litigation as insurance companies. In cases in which punitive damages are not appropriate, an insurer denying a valid claim can face a judgment that includes prejudgment interest and the claimant's attorneys' fees, over and above the policy benefits. Moreover, if an insurer denies its insured's claim without any reasonable basis or knowingly engages in a statutorily prohibited practice, then it faces either extracontractual bad faith damages or statutory treble damages, respectively. Finally, insurers must ordinarily pay their own litigation costs even if they prevail on the coverage issue.

*Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991), the Supreme Court expressed concern that punitive damages might "run wild," recognizing that unlimited discretion on the part of a jury or reviewing court "may invite extreme results that jar one's constitutional sensibilities." The Court did not, however, set forth specific due process guidelines, but merely held that the Alabama system under scrutiny in *Haslip* passed constitutional muster. The Court focused on the jury instruction, which provided some limit on the jury's discretion, and the process of post-verdict review by Alabama trial and appellate courts.

The jury instruction in *Haslip* explained that the purpose of punitive damages is to "punish the defendant" and "for the added purpose of protecting the public by [deterring] the defendant and others from doing such wrong in the future." *Id.* at 19, 111 S.Ct. at 1044. The instruction further explained that punitive damages are not compulsory, and that in awarding damages a jury "must take into consideration the character and the degree of the wrong as shown by the evidence and necessity of preventing similar wrong." *Id.* The Court held that the jury's discretion under this instruction, although significant, was not unlimited, as it "was confined to deterrence and retribution, the state policy concerns sought to be advanced." *Id.* The Court concluded that this instruction "reasonably accommodated [the defendant's]

interest in rational decisionmaking and Alabama's interest in meaningful individualized assessment of appropriate deterrence and retribution." [22] *Id.* at 20, 111 S.Ct. at 1044.

The Court next examined post-verdict review of punitive damages by Alabama trial courts. These courts must scrutinize each award, considering such factors as "the culpability of the defendant's conduct," the "desirability of discouraging others from similar conduct," the "impact upon the parties," and "other factors, such as the impact on innocent third parties." *Id.* (quoting *Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala.1986)). Alabama trial courts must also state on the record their reasons for interfering with the verdict or refusing to do so. *Id.* The Court held that these procedures provide "meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages." *Id.*

The Court finally focused on appellate review of Alabama punitive damage awards, which "provides an additional check on the jury's or trial court's discretion." *Id.* 499 U.S. at 20–22, 111 S.Ct. at 1045. The Alabama Supreme Court first undertakes a comparative analysis, and then applies "detailed substantive standards" to evaluate the award,[23] making sure that the award "does not exceed an amount that will accomplish society's goals of punishment and deterrence." *Id.* at 21, 111 S.Ct. at 1045 (citing *Green Oil Co. v. Hornsby,* 539 So.2d 218, 222

---

**22.** The jury instruction used in this case is more comprehensive than that in *Haslip,* and thus would presumably pass scrutiny under the United States Constitution. It provided as follows:

The term "punitive damages" is an amount which you may, in your discretion, award as an example to others and as a penalty or by way of punishment, in addition to any amount you may have found as actual damages.

In determining that amount, you may consider—

1. the nature of the wrong,
2. the frequency of the wrongs committed,
3. the character of the conduct involved,
4. the degree of culpability of the wrongdoer,
5. the situation and sensibilities of the parties concerned,
6. the extent to which such conduct offends a public sense of justice and propriety, and
7. the size of the award needed to deter similar wrongs in the future.

**23.** These standards include:

a) whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred; b) the degree of reprehensibility of the defendant's conduct, the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct; (c) the profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss; (d) the "financial position" of the defendant; (e) all the costs of litigation; (f) the imposition of criminal sanctions on the defendant for its conduct, these to be taken in mitigation; and (g) the existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation.
499 U.S. at 21–22, 111 S.Ct. at 1045–46.

(Ala.1989); *Wilson v. Dukona Corp.,* 547 So.2d 70, 73 (Ala.1989)). "This appellate review makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." [24] *Id.*

In conclusion, the Court held that the Alabama procedures did not violate due process, as their application "imposes a sufficiently definite and meaningful constraint on the discretion of Alabama factfinders in awarding punitive damages. The Alabama Supreme Court's postverdict review ensures that punitive damages awards are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Id.* at 22, 111 S.Ct. at 1045.

The Supreme Court again examined the constitutional issues surrounding punitive damages in *TXO Prod. Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). That case involved a West Virginia slander of title action in which the jury awarded compensatory damages of $19,000 and punitive damages of $10 million. The Court upheld the punitive award against a procedural and substantive due process attack, although there was no majority opinion.

The West Virginia procedures in *TXO* differed from those previously examined in *Haslip* in that the trial court did not articulate its reasons for upholding the large punitive damages verdict. The Court nevertheless concluded that this was not a constitutional defect, *id.* —— U.S. at ——, 113 S.Ct. at 2724 (plurality opinion of Stevens, J.,

joined by Rehnquist, C.J., and Blackmun & Kennedy, JJ.); *id.* —— U.S. at ——, 113 S.Ct. at 2726 (Scalia, J., concurring, joined by Thomas, J.), but the plurality emphasized that the trial judge did "give counsel an adequate hearing on TXO's postverdict motions." *Id.* —— U.S. at ——, 113 S.Ct. at 2742.

Many aspects of the procedures employed up to now by Texas courts do not compare favorably to those examined in *Haslip* and *TXO*. First, although a defendant may obtain trial court review of a punitive damage award by filing a motion for new trial, TEX. R.CIV.P. 320, there has been no requirement that trial courts scrutinize each award, setting forth reasons on the record for refusing to disturb a jury verdict. Indeed, trial courts have not even been required to rule on motions for new trial as the passage of time may serve to overrule a new trial motion by operation of law. TEX.R.CIV.P. 329b(c). Thus, the judge who heard first-hand the evidence in a case, and who is uniquely positioned to determine whether the jury's award was based on passion or prejudice rather than reason, is not required to perform a meaningful review of the award.

Second, although this Court has set forth factors to guide Texas courts of appeals in evaluating punitive damages awards, *see Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex.1981), a court of appeals may overturn the jury's verdict and order the case retried only if the verdict "is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).[25]

---

**24.** Appellate review in Alabama determines whether the *amount* of the award is excessive under the circumstances of the case, but the Court viewed this as a procedural due process protection, as it provides a post-hoc check on the jury's discretion. 499 U.S. at 22–23, 111 S.Ct. at 1045–46. Justice O'Connor questioned whether appellate review, even if it did ensure that the amount of the punitive award was not excessive, could cure a jury instruction she found to be unconstitutionally vague. *Id.* at 43–44, 111 S.Ct. at 1056–57 (O'Connor, J., dissenting).

**25.** The burden in Texas for reversing a punitive damages verdict on appeal does not appear functionally different from that in Alabama and West Virginia. A Texas court of appeals may overturn

the jury's verdict and order a new trial if the verdict "is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Pool,* 715 S.W.2d at 635; *In Re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). In Alabama, the "presumption of correctness" accorded to the jury's verdict may be overcome by "a clear showing that the amount of the verdict is excessive," *Wilson v. Dukona Corp.,* 547 So.2d 70, 72 (Ala.1989), while in West Virginia an award may be reversed on appeal if it is "so unreasonable as to demonstrate such passion and prejudice that a new trial is warranted." *TXO Prod. Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870, 890 (1992), *aff'd,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366

Moreover, this court, unlike its counterparts in Alabama, West Virginia, and most other states, is precluded from reviewing the evidence supporting a punitive damages award for factual sufficiency. TEX. CONST. art. V, § 6; TEX.GOV'T CODE § 22.225(a); *Kraus*, 616 S.W.2d at 910. Although due process does not require two levels of appellate review, this aspect of Texas procedure means that the evidence supporting a punitive award is scrutinized less closely on appeal to the highest court here than in some other states.

The broad jury discretion that is the hallmark of the common law punitive damages system must be complemented by procedural safeguards that will ensure against excessive or otherwise inappropriate awards.[26] We conclude that the Texas procedures for assessing and reviewing punitive damage awards, both at the trial and appellate levels, in some respects may not adequately ensure that such awards "are not grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Haslip*, 499 U.S. at 22, 111 S.Ct. at 1045. Although we do not reach the question whether the procedures previously employed violated either the state or federal[27] constitutions, pursuant to our authority under the common law, we announce two changes in the procedures by which punitive damages may be sought. In our view, these modifications will not only enhance the overall fairness and predictability of punitive damage awards, but they should also ameliorate some of the potential arbitrariness that inheres in our current system.

Although Transportation argues for procedural changes only on constitutional grounds, various amici curiae alternatively argue for

common-law reform. Justice Kennedy suggested this approach in *Haslip*:

> We do not have the authority, as do judges in some of the States, to alter the rules of the common law respecting the proper standard for awarding punitive damages and the respective roles of the jury and the court in making that determination. Were we sitting as state-court judges, the size and recurring unpredictability of punitive damages awards might be a convincing argument to reconsider those rules or to urge a reexamination by the legislative authority.

499 U.S. at 42, 111 S.Ct. at 1056 (Kennedy, J., concurring). Other state supreme courts have recently modified their punitive damage procedures without holding those procedures unconstitutional. *See Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350 (1991); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992); *Crookston v. Fire Ins. Exch.*, 817 P.2d 789 (Utah 1991).

## A. Bifurcation

We held in *Lunsford v. Morris*, 746 S.W.2d 471 (Tex.1988), that evidence of a defendant's net worth is relevant in determining the proper amount of punitive damages, and therefore may be subject to pretrial discovery. This decision aligned Texas with the overwhelming majority of other jurisdictions on this issue. *See Lunsford*, 746 S.W.2d at 472 n. 2. As we noted in *Lunsford*, the amount of punitive damages necessary to punish and deter wrongful conduct depends on the financial strength of the defendant. "That which could be an enormous penalty to one may be but a mere annoyance to another." *Id.* at 472.

(1993). Although the words used are quite different, we are not convinced that there is a meaningful difference among these respective standards that would produce a different result.

**26.** The only aspect of Texas procedure to clearly meet or exceed the minimal requirements has been the instructions given to juries. A Texas jury, although possessing significant discretion in awarding punitive damages, receives more guidance than did the jury in *Haslip*. *See supra* note 21. Texas jurors are instructed on the factors set forth in *Kraus*, 616 S.W.2d at 910, and thus

determine the amount of the award based on the same criteria that the trial and appellate courts use in determining whether the award is excessive.

**27.** The United States Court of Appeals for the Fifth Circuit has considered the existing Texas procedures for imposing punitive damage awards in light of *Haslip*, and concluded that they do not violate federal due process. *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085 (5th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992).

However, evidence of a defendant's net worth, which is generally relevant only to the *amount* of punitive damages, by highlighting the relative wealth of a defendant, has a very real potential for prejudicing the jury's determination of other disputed issues in a tort case. We therefore conclude that a trial court, if presented with a timely motion, should bifurcate the determination of the amount of punitive damages from the remaining issues. *See Wal–Mart*, 868 S.W.2d at 329–32 (Gonzalez, J., concurring). Under this approach, the jury first hears evidence relevant to liability for actual damages, the amount of actual damages, and liability for punitive damages (e.g., gross negligence), and then returns findings on these issues. If the jury answers the punitive damage liability question in the plaintiff's favor, the same jury is then presented evidence relevant only to the amount of punitive damages, and determines the proper amount of punitive damages, considering the totality of the evidence presented at both phases of the trial.

At least thirteen states now require bifurcation of trials in which punitive damages are sought.[28] Ten of these, California, Georgia, Kansas, Missouri, Montana, Nevada, Ohio, Tennessee, Utah, and Wyoming, generally follow the procedure outlined above, in which the *amount* of punitive damages is bifurcated from the remaining issues. The other states require bifurcation of the entire punitive damage claim, including liability and amount. We believe the former approach is preferable, as some of the evidence relevant to

punitive damage *liability*, such as evidence of gross negligence, will also be relevant to liability for actual damages. Bifurcating only the amount of punitive damages therefore eliminates the most serious risk of prejudice, while minimizing the confusion and inefficiency that can result from a bifurcated trial. *See Lunsford*, 746 S.W.2d at 477 (Phillips, C.J., dissenting on motion for reh'g).[29]

The issue in this Court is not whether *bifurcation of punitive damage claims* is constitutionally required, but whether our system of imposing punitive damages, on the whole, provides adequate procedural safeguards to protect against awards that are grossly excessive. Concluding that the current procedures are not adequate, we hereby adopt the requirement of bifurcated trials in punitive damage cases.

### B. Court of Appeals Review of the Evidence

 A court of appeals may vacate a damage award or suggest a remittitur only if the award is "so factually insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust." *Pope v. Moore*, 711 S.W.2d 622, 624 (Tex. 1986); *see Pool*, 715 S.W.2d at 635; *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). A court of appeals is also governed by this same standard when reviewing a trial court's suggestion of remittitur. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640 (Tex. 1987). While we do not alter this level of

**28.** Cal.Civ.Code § 3295(d) (West Supp.1993); Ga. Code Ann. § 51–12–5.1(d) (Supp.1992); Kan.Stat. Ann. § 60–3701(a) (Supp.1993); Minn.Stat.Ann. § 549.20(4) (West Supp.1993); Mo.Ann.Stat. § 510.263 (Vernon Supp.1992); Mont.Code Ann. § 27–1–221(7) (1991); Nev.Rev.Stat. § 42.005(3) (1991); N.J.Stat.Ann. § 2A:58C–5(b) (West 1987); N.D.Cent.Code § 32–03.2–11(2) through (4) (1993); Ohio Rev.Code Ann. § 2315.21(C) (Baldwin 1993); Utah Code Ann. § 78–18–1(2) (1992); *Campen v. Stone*, 635 P.2d 1121, 1132 (Wyo. 1981); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn.1992).

**29.** Despite the authority of trial courts to order separate trials under Tex.R.Civ.P. 174(b), we have previously held that liability and damages may not be bifurcated in a personal injury action. *Iley v. Hughes*, 158 Tex. 362, 311 S.W.2d 648, 651 (1958). Citing our "long standing policy and practice" against "piecemeal trials," *id.* 311

S.W.2d at 651, the court said: "[T]he public interest, the interests of litigants and the administration of justice [are] better served by rules of trial which avoid a multiplicity of suits." *Id.* Arguably, this holding would apply to punitive, as well as actual, liability and damages. *But see Beverly Enterprises of Texas, Inc. v. Leath*, 829 S.W.2d 382, 387 (Tex.App.—Waco 1992, no writ) (the court, without citing *Iley v. Hughes*, held that a trial court does have discretion under Rule 174(b) to bifurcate the amount of punitive damages from punitive liability); *Miller v. O'Neill*, 775 S.W.2d 56, 59 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding) (same). Although we remain resolute that piecemeal trials as a general rule should be avoided, given the importance of the considerations we have discussed, we conclude that punitive damage cases should be the exception to the rule.

appellate deference,[30] we emphasize that courts of appeals must carefully scrutinize punitive awards to ensure that they are supported by the evidence. We have already held in *Pool* that courts of appeals, when reversing on insufficiency grounds, should detail the evidence in their opinions and explain why the jury's finding is factually insufficient or is so against the great weight and preponderance of the evidence as to be manifestly unjust. 715 S.W.2d at 635. Due to the jury's broad discretion in imposing punitive damages, we believe that a similar type of review is appropriate when a court of appeals is *affirming* such an award over a challenge that it is based on insufficient evidence or is against the great weight and preponderance of the evidence. This will ensure careful appellate review of the punitive award, and allow this court to determine whether the court of appeals correctly applied the *Kraus* factors. Thus, we hold that the court of appeals, when conducting a factual sufficiency review of a punitive damages award, must hereafter detail the relevant evidence in its opinion, explaining why that evidence either supports or does not support the punitive damages award in light of the *Kraus* factors.

### C. Clear and Convincing Evidence

 Clear and convincing evidence is "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *State v. Addington,* 588 S.W.2d 569, 570 (Tex. 1979); Tex.Fam.Code § 11.15(c) (Vernon 1986). Many states have raised the evidentiary burden for gross negligence and punitive damages from "a preponderance of the evidence" to "clear and convincing evidence." *See Linthicum,* 723 P.2d at 681; *Masaki v. General Motors Corp.,* 71 Haw. 1, 780 P.2d 566, 575–75 (1989); *Tuttle v. Raymond,* 494 A.2d 1353, 1363 (Me.1985); *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 601 A.2d 633, 657 (1992); *Hodges v. S.C. Toof & Co.,* 833

S.W.2d 896, 901 (Tenn.1992); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 443 (1980); Ala.Code § 6–11–20 (Supp. 1993); Alaska Stat. § 09.17.020 (Supp.1991); Cal.Civ.Code § 3294(a) (West Supp.1994); Ga.Code Ann. § 51–12–5.1(b) (Supp.1991); Ind.Code Ann. § 34–4–34–2 (Burns Supp. 1993); Iowa Code Ann. § 668A.1(1)(a) (West 1987); Kan.Stat.Ann. § 60–3701(c) (Supp. 1992); Ky.Rev.Stat.Ann. § 411.184(2) (Michie/Bobbs–Morril Supp.1993); Minn.Stat. Ann. § 549.20(1)(a) (West Supp.1994); Mont. Code Ann. § 27–1–221(5) (1991); Nev.Rev. Stat.Ann. § 42.005(1) (Supp.1993); N.D.Cent.Code § 32–03.2–11 (Supp.1993); Ohio Rev.Code Ann. § 2307.80(A) (Anderson 1991); Or.Rev.Stat. § 30.925 (1991); S.C.Code Ann. § 15–33–135 (Law Coop.Supp. 1991); Utah Code Ann. § 78–18–1 (Supp. 1992); *see also* Colo.Rev.Stat. § 13–25– 127(2) (1989) (requiring proof beyond a reasonable doubt); Fla.Stat.Ann. Ch. 768.- 73(1)(b) (Harrison Supp.1992) (punitive damages in excess of cap allowed if claimant demonstrates to the court by clear and convincing evidence that award is not excessive); Okla.Stat.Ann. tit. 23, § 9 (West 1987) (clear and convincing evidence required to award punitive damages in excess of cap); S.D.Codified Laws Ann. § 21–1–4.1 (1987) (discovery on the punitive damages claim and submission of the punitive damages claim to the jury cannot occur unless the court finds "after a hearing and based on clear and convincing evidence" that there is a reasonable basis to believe that the defendant engaged in willful, wanton, or malicious conduct).

This change has also been endorsed by commentators, *see* Dorsey D. Ellis, *Punitive Damages, Due Process, and the Jury,* 40 Ala.L.Rev. 975, 993–995 (1989); American Law Institute, Reporters' Study, II *Enterprise Responsibility for Personal Injury— Approaches to Legal and Institutional Change* 248–249 (1991), and favorably noted by the Supreme Court. *Haslip,* 499 U.S. at 23 n. 11, 111 S.Ct. at 1046 n. 11 (while not

---

**30.** The Supreme Court in *Haslip* distinguished Alabama's appellate review, under which the court applies detailed substantive standards, from the Vermont scheme, which allows an award to be set aside only if it is "manifestly and grossly excessive." 499 U.S. at 21 n. 10, 111 S.Ct. at 1045 n. 10. Although Texas also uses a "manifestly unjust" standard, our review is actually more aligned with Alabama's in that the court of appeals makes this determination by applying the specific *Kraus* factors.

constitutionally required, "[t]here is much to be said in favor of [the clear and convincing standard] or, even, 'beyond a reasonable doubt,' . . . as in the criminal context").

Notwithstanding this support in other jurisdictions,[31] our Legislature expressly considered and rejected the clear and convincing evidence standard for punitive damages as part of its 1987 tort-reform legislation. *See* Montford & Barber, 25 HOUS.L.REV. at 333. As this higher burden is not constitutionally compelled, *see Haslip*, 499 U.S. at 23 n. 11, 111 S.Ct. 1046 n. 11, the usual preponderance standard would remain the law in cases governed by the Act. Inasmuch as application of different evidentiary standards, depending on whether a case is governed by tort-reform legislation would be unnecessarily confusing, we decline to adopt the clear and convincing standard pursuant to our common-law authority at this time.

### D. Trial Court Articulation

▮▮▮ The Supreme Court emphasized in *Haslip* that trial courts in Alabama are required to scrutinize punitive damage awards, reflecting on the record their reasons for upholding or refusing to uphold the award. 499 U.S. at 20, 111 S.Ct. at 1044–45. The Court concluded that this procedure ensured "meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages." *Id.* In Texas, trial courts have not been required to articulate their reasons for upholding punitive awards, or even to take affirmative steps to consider post trial objections to a punitive damage award.

As noted by the Utah Supreme Court in adopting this requirement:

The reason that any determination as to whether the jury exceeded its proper bounds is best made in the first instance by the trial court is that the trial judge is present during all aspects of the trial and listens to and views all witnesses. Therefore, he or she can best determine if the jury has acted with "passion or prejudice"

and whether the award is too small or too large in light of the evidence.

*Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 804 (Utah 1991). Meaningful trial court review is especially important in Texas because of the deference which our courts of appeals must give to jury verdicts, *see Pool*, 715 S.W.2d at 635, and the absence of this court's jurisdiction to review factual sufficiency points.

At least eight jurisdictions now expressly require the trial court to articulate its reasons for refusing to disturb a punitive damage award. *See Hammond v. City of Gadsden*, 493 So.2d 1374, 1379 (Ala.1986); *O'Dell v. Basabe*, 119 Idaho 796, 810 P.2d 1082, 1092 (1991); *Medical Mut. Liab. Ins. Soc'y v. B. Dixon Evander & Assocs.*, 92 Md.App. 551, 609 A.2d 353, 368–69 (1992) (not per se required, but trial court's failure to explain reasoning may constitute abuse of discretion); *GN Danavox, Inc. v. Starkey Labs., Inc.*, 476 N.W.2d 172, 177 (Minn.App.1991, review denied), *cert. denied*, —— U.S. ——, 112 S.Ct. 2940, 119 L.Ed.2d 565 (1992); *Gamble v. Stevenson*, 305 S.C. 104, 406 S.E.2d 350, 354 (1991); *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 902 (Tenn.1992); *Crookston v. Fire Ins. Exch.*, 817 P.2d 789, 811 (Utah 1991) (requiring trial court articulation whenever ratio of punitive damages to actual damages exceeds 3:1); *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897, 910 (1991). Most of these jurisdictions have adopted this requirement after *Haslip*. Moreover, several federal appellate courts reviewing punitive damage awards since *Haslip* have remanded the cases to the trial court with instructions to articulate the reasons for upholding the award. *See Cole v. Control Data Corp.*, 947 F.2d 313, 321 (8th Cir.1991); *Union Nat'l Bank v. Mosbacher*, 933 F.2d 1440, 1448 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 870, 116 L.Ed.2d 775 (1992); *American Employers Ins. Co. v. Southern Seeding Servs., Inc.*, 931 F.2d 1453, 1458 (11th Cir.1991); *Robertson Oil Co. v. Phillips Petroleum Co.*, 930 F.2d 1342, 1347 (8th Cir.1991).

---

**31.** *Accord Ford Motor Co. v. Durrill*, 714 S.W.2d 329, 347 (Tex.App.—Corpus Christi 1986), *judgm't vacated by agreement*, 754 S.W.2d 646 (Tex.1988) (acknowledging, although ultimately rejecting, the strength of arguments in support of clear and convincing standard for punitive damages).

We are sensitive to the demands already placed on our trial courts, which are overworked and understaffed. More than most states, Texas permits local governments to decide what levels of staffing, housing and equipment are appropriate to operate the state courts. NATIONAL CENTER FOR STATE COURTS, SURVEY (1985). While some counties make excellent provision for their courts, in many instances this "reliance on the counties to fund most of the courts is one source of chronic fiscal crisis." AMERICAN BAR ASSOCIATION SPECIAL COMMITTEE ON FUNDING THE COURT SYSTEM, FUNDING THE JUSTICE SYSTEM: A CALL TO ACTION 54 (1992) (analyzing Texas court funding). As a result, Texas trial courts are generally badly understaffed. *See id.* A recent survey indicates that about seventy percent of Texas district judges have no access to secretarial services, while even fewer have paid law clerks. OFFICE OF COURT ADMINISTRATION OF TEXAS, DISTRICT COURT RESOURCES SURVEY (June 1990).

Although we have on occasion suggested that our trial courts make specific findings not required by statute or rule, *see Chrysler v. Blackmon,* 841 S.W.2d 844 (1992), we do not do so lightly. While such a practice would facilitate meaningful post-verdict review of punitive damage awards at both the trial and appellate levels, we will not require such findings as a prerequisite for a judgment including punitive damages. We do observe that such findings "would obviously be helpful," *Transamerican Natural Gas v. Powell,* 811 S.W.2d 913, 919 n. 9 (Tex.1991), and urge that such findings be made to the extent practicable.

For the foregoing reasons, we reverse the judgment of the court of appeals and remand this case for a new trial in accordance with this opinion.

DOGGETT, Justice, joined by GAMMAGE, Justice, concurring.

In response to revisions to the majority opinion made during the pendency of the motion for rehearing, my opinion of February 2, 1994 is withdrawn and the following is substituted.

Undoubtedly the insurance industry provides an important service to our society, but I see no reason why it should not have to comply with the law like the rest of us. Because of the tremendous economic power large insurers can exert relative to individual Texas families and businesses, this Court has sought to offer policyholders some protection. Without a meaningful remedy against insurance companies that dishonor their policies, "unscrupulous insurers [can] take advantage of their insureds' misfortunes." *Arnold v. National County Mut. Life Ins. Co.,* 725 S.W.2d 165, 167 (Tex.1987).

But the majority's mission in recent months has been to dismantle, as much as possible, the different safeguards that insurance policyholders and beneficiaries have been previously assured by the laws of Texas. Instead of fairness to all, the majority has replaced protection of insureds with protection of insurers, leaving the insurance industry largely free to do as it pleases. *See, e.g., Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132 (1994); *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145 (1993); *Lyons v. Millers Casualty Ins. Co.,* 866 S.W.2d 597 (Tex.1993); *National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373 (Tex.1994); *Spencer v. Eagle Star Ins. Co. of America,* 860 S.W.2d 868 (1993). It is as if, to borrow a phrase from Will Rogers, this majority never met an insurance company it didn't like.

When dealing with a large insurance company, one danger against which insureds need protection is profitable indifference. *See, e.g., Weisman v. Blue Shield of California,* 163 Cal.App.3d 61, 209 Cal.Rptr. 169, 173 (1984) (upholding punitive damages on showing insurer had "overriding concern for a minimum-expense operation, regardless of the peril involved"). As long as the actual damages suffered by an insured is relatively small in comparison to an insurer's very substantial assets, liability for actual damages may offer little incentive to provide care and promptness in processing claims. Referenced by the majority as illustrating its new standard, *Silberg v. California Life Ins. Co.,* 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974) (en banc), indicates the magnitude of suffering a Texas policyholder must henceforth endure before invoking the punitive damages remedy that today's opinion

seeks to eliminate. 879 S.W.2d at 24. Punitive damages will be deemed appropriate only in circumstances such as those where the insurer's bad faith effectively denies an insured surgical treatment and pain medication, destroys his business, produces two nervous breakdowns *and* causes loss of his wheelchair to the repo man. *Id.* And even then the insured must also show that the company actually knew such consequences would result.

## I.

I believe in reasonable constraints on the use of punitive damages against insurance companies as well as any other defendant. Had there been the slightest interest in achieving that objective on a principled basis, consistent with our prior jurisprudence, we could long ago have resolved this cause with unanimity. But the majority is committed to fulfilling its social agenda at any cost—mere precedent, a procedural rule, a statute or the Texas Constitution present no obstacles on the way to achieving whatever it perceives to be of ultimate benefit.

With judgments for punitive damages at times involving substantial amounts, this court should thoroughly review individual cases and the broader legal standards upon which they are decided to guarantee that justice is truly being rendered. Certainly not all misconduct should give rise to damages in an amount greater than that necessary to compensate the victim. Adjudging more than compensatory damages in the absence of conscious indifference only adds one wrong to another by wronging the wrongdoer. Most assuredly, some concerns of commercial interests regarding aberrational verdicts are legitimate, but such decisions do

not reflect a systemic "crisis"; rather they reinforce the need for careful case-by-case review of punitive determinations.

Accordingly, we must ensure that courts of appeals conduct a most careful review of the factual sufficiency of evidence. I am also sympathetic to the concept of requiring bifurcation of the determination of the amount of punitive damages, but insurance companies should be held to ordinary requirements of preservation of error like other litigants. Despite Transportation's unquestionable waiver of any complaint about bifurcation,[1] today's opinion decides this issue.

Though with this majority it may seem a rather antiquated notion, I still believe that judges should resolve the issues the parties properly present rather than those that the judges wish that had presented.[2] Ironically, one major complaint that Transportation did specifically urge is one that the majority chooses to sidestep. I would agree with the insurer on this point by requiring that a trial court articulate reasons for overruling a motion for new trial challenging an award of punitive damages. Articulation ensures "meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages." *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 19–20, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991). Who better to determine

> whether the jury exceeded its proper bounds [than] the trial judge [who] is present during all aspects of the trial and listens to and views all witnesses. Therefore, he or she can best determine if the jury has acted with "passion or prejudice" and whether the award is too small or too large in light of the evidence.

---

1. Rather than bifurcation, Transportation proposed in a motion in limine to prohibit introduction of evidence of its financial status "until sufficient evidence [of liability for punitive damages] ha[d] been introduced to warrant [such] introduction;" the trial court granted this relief. Not until its motion for new trial did Transportation belatedly make any request for bifurcation. Nor did it request bifurcation in its application for writ of error.

2. In its quest to radically rewrite the state's tort law, the majority ignores the prudential limitations applicable to the judicial branch of govern-

ment. Besides deciding a bifurcation issue that was not before the Court, the majority purports to make significant revisions to the law governing an insurer's duty of good faith and fair dealing even though Transportation's liability for a bad faith breach was not at issue here. *See infra* notes 13–16 and accompanying text. The majority also purports to render an interpretation of the statutory definition of gross negligence found in the Texas Civil Practice and Remedies Code, even though this case is not governed by that statute. *See infra* note 22 and note 33 and accompanying text.

*Crookston v. Ins. Exchange,* 817 P.2d 789, 804 (Utah 1991) (requiring trial court articulation where ratio of punitive damages to actual damages exceeds 3:1).

In addition to Utah, seven other states now require such articulation[3] as have some federal courts.[4] Though conceding that such articulation "would facilitate meaningful post-verdict review of punitive damage awards," would be "helpful," 879 S.W.2d 33, the majority rejects Transportation's request. I would grant it and remand to the trial court for such articulation. *Compare Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 850–53 (Tex. 1992) (requiring trial court to make findings of fact and conclusions of law or to explain reasons for imposing severe discovery sanctions).

Such a remand is, however, quite different from that provided by today's opinion, which has its origins in the great misadventure in *Boyles v. Kerr,* 855 S.W.2d 593, 603 (Tex. 1993), a decision upon which the majority now relies. There remand was employed simply as an artificial face-saving device for the majority. There was no harm in a remand, so long as the claimant was likely, under the newly announced law, to lose on retrial anyway.[5] And this added the glow of justice to a great injustice. Today's remand is more of the same. If the majority is correct that there is really no evidence of gross negligence, Transportation is entitled to rendition rather than wasting the resources of all parties on a meaningless exercise.

A further safeguard for all parties is the avoidance of a standardless charge that leaves the jury without meaningful guidance in performing its vital task. A proper instruction of the type now incorporated into the Texas Pattern Jury Charge[6] was employed here. As I note in *Alexander,* 868 S.W.2d at 334 (Doggett, J., dissenting), that can be followed by appellate review that considers, in light of the trial court's articulation, these same factors, outlined in *Alamo Nat'l Bank v. Kraus,* 616 S.W.2d 908, 910 (Tex. 1981):

> [I]n determining the reasonableness of the amount of an exemplary damages verdict, an appellate court must consider 1) the nature of the wrong, 2) the character of the conduct involved, 3) the degree of the culpability of the wrongdoer, 4) the situation and the sensibilities of the parties concerned, 5) the extent to which such conduct offends a public sense of justice and propriety.

And there may well be other moderate reforms, which when properly presented, can ensure greater fairness.

But the majority rejects this rational approach and, instead, attempts to rewrite the history of the law and ignores our Constitution by treating punitive damages themselves as an aberration—establishing new barriers that threaten to eliminate entirely the effectiveness of this long-established method by which a community can impose penalties to deter egregious wrongdoing. Today's endeavor represents another phase in the majority's construction of a legal bulwark to shield large insurance companies from any

---

**3.** *See Hammond v. City of Gadsden,* 493 So.2d 1374, 1379 (Ala.1986); *O'Dell v. Basabe,* 119 Idaho 796, 810 P.2d 1082, 1092 (1991); *Medical Mut. Liab. Ins. Soc. v. B. Dixon Evander & Assocs.,* 92 Md.App. 551, 609 A.2d 353, 368–69 (1992) (not per se required, but trial court's failure to explain reasoning may constitute abuse of discretion); *GN Danavox, Inc. v. Starkey Labs., Inc.,* 476 N.W.2d 172, 177 (Minn.App.1991); *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350, 354 (1991); *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896, 902 (Tenn.1992); *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897, 910 (1991).

**4.** *See Cole v. Control Data Corp.,* 947 F.2d 313 (8th Cir.1991); *Union National Bank v. Mosbach-*

er, 933 F.2d 1440, 1448 (8th Cir.1991); *American Employers Ins. Co. v. Southern Seeding Services, Inc.,* 931 F.2d 1453, 1458 (11th Cir.1991); *Robertson Oil Co. v. Phillips Petroleum Co.,* 930 F.2d 1342, 1347 (8th Cir.1991).

**5.** "Most likely being led down the garden path, Susan Kerr is now directed back to the trial court to pursue this new cause of action, in which those who are injured are 'seldom successful.'" *Id.* at 609 (Doggett, J., dissenting on rehearing) (quoting *Twyman v. Twyman,* 855 S.W.2d 619, 631 (Tex.1993) (Hecht, J., dissenting)).

**6.** 2 State Bar of Texas, Tex.Pattern Jury Charges § 29.03 (1992).

attempt by juries to discourage particularly outrageous and offensive behavior.

## II.

Though now misdescribed by the majority as a recent deviance of an "exceptional nature," in contradistinction to "typical" tort law, 879 S.W.2d at 16–17, punitive damages "have been in existence since the Code of Hammarabi in 2000 B.C." 1 LINDA L. SCHLUETER & KENNETH R. REDDEN, PUNITIVE DAMAGES § 1.0 at 3 (2d ed., 1989).[7] The original suit under the English common law, predating the distinction between civil and criminal, was an "appeal" brought by a private party having "the double object of satisfying the private party for his loss, and the king for the breach of his peace."[8] OLIVER WENDELL HOLMES, THE COMMON LAW 34 (Little Brown 1963); see CUSHMAN K. DAVIS, THE LAW IN SHAKESPEARE 153 (1883). The purpose of such an action was not limited to compensation; rather "[t]he King or other lord exacted further payments from the wrongdoer ... on the ground that every evil deed inflicts a wrong on society in general, as well upon its victim." WILLIAM S. MCKECHNIE, MAGNA CARTA 285 (1914). Even as the law came to distinguish between criminal and civil actions, jurors had near complete discretion over the amount of damages awarded in civil suits "[u]ntil comparatively recent times." 1 SEDGWICK ON DAMAGES § 349, at 688 (9th ed., 1912). See, e.g., Townsend v. Hughes, 86 Eng.Rep. 994, 994–95 (C.P.1649) (courts should not interfere with jury's power to award damages). By the end of the 18th century, as recovery for damages became limited to specific standardized categories dependent on the nature of the claim, jurors nevertheless retained near absolute discretion to set damages that would punish outra-geous behavior and discourage oppression. SEDGWICK ON DAMAGES § 349, at 689; Continuity of Punitive Damages, 42 AM.U.L.REV. at 1287–89, 1292–96. See also Wilkes v. Wood, Lofft. 1, 18–19, 98 Eng.Rep. 489, 498–99 (K.B.1763) (upholding £1000 punitive damage verdict against King's agent on grounds that "[d]amages are designed not only as satisfaction to the injured person, but likewise as punishment to the guilty, to deter from any such proceeding for the future and as proof of the detestation of the jury to the action itself"). These damages were known as "punitive," "exemplary" or "vindictive" damages. SEDGWICK ON DAMAGES § 347, at 687.

In the leading authority identifying them as a separate species of damages, "exemplary damages" were assessed against a government official for a printer who suffered arrest and seizure of his equipment, as a result of criticizing the King. Huckle v. Money, 2 Wils.K.B. 205, 95 Eng.Rep. 768 (C.P.1763). Although actual damages were estimated by the court to be less than £20, the jury awarded £300. Id. In refusing an effort to overturn the verdict as excessive, the court declared:

[I]t is very dangerous for Judges to intermeddle in damages for torts....

[The jury] saw a magistrate over all the King's subjects, exercising arbitrary power, violating Magna Charta, and attempting to destroy the liberty of the Kingdom by insisting upon the legality of the warrant before them; they heard the King's Counsel, and saw the solicitor of the Treasury endeavoring to support and maintain the legality of the warrant in a tyrannical and severe manner. These are the ideas which struck the jury on the trial; and I

---

7. Punitive damages were also recognized in Roman Law and in the Vedic Law of Manu. Michael Rustad & Thomas Koenig, The Historical Continuity of Punitive Damages: Reforming the Tort Reformers, 42 AM.U.L.REV. 1264, 1285–86, (1993) [hereinafter, Continuity of Punitives]

8. Moreover, an informer, as a qui tam plaintiff, could file ordinary general writs against individuals who had wronged the King. Note, The History and Development of Qui Tam, 1972 WASH. U.L.Q. 81, 87 (Since the thirteenth century private individuals could bring qui tam lawsuits to protect the King's interests). By the fifteenth century, statutes were enacted to ensure that the qui tam plaintiff received a share of the recovery assessed against the defendants. Id. Qui tam causes of action, permitting a civil litigant who had suffered no individualized injury to recover noncompensatory penalties from wrongdoers, have "been in existence ... in this country ever since the foundation of our government." Marvin v. Trout, 199 U.S. 212, 225, 26 S.Ct. 31, 34–35, 50 L.Ed. 157 (1905).

think they have done right in giving exemplary damages.

*Id.* at 769 (Camden, C.J.).

> Whenever an injury is done under the color of authority, as if an officer empowered to press exceed the authority given him by the press warrant; or if the master of the ship abuse the power by law vested in him over the sailors under this command ... the jury in assessing damages is not confined to the damages which have actually been sustained, but ought to assess exemplary damages.

*Huckle v. Money* (Camden, C.J.), *quoted in* 1 SEDGWICK ON DAMAGES § 350, at 690 (citing SAYER ON DAMAGES 220). Punitive damages were thus established as a fundamental method by which the misuse of power could be deterred. *See generally Continuity of Punitives,* 42 AM.U.L.REV. at 1287–89, 1292–96.

American courts early accepted this same function for punitive damages. *See, e.g., Genay v. Norris,* 1 S.C. 6 (1784) (awarding vindictive damages against physician who spiked enemy's drink with toxin causing "extreme and excruciating pain"); *Coryell v. Colbaugh,* 1 N.J. (Coxe) 77 (1791) (holding that injuries of an "atrocious and dishonorable nature" call for exemplary damages "for example's sake, to prevent such offenses in the future"); *Tillotson v. Cheetham,* 3 Johns. 351 (N.Y.Sup.Ct.1808) (citing *Huckle* for rule that exemplary damages are appropriate when personal injury is small but liberty interests are at stake); *Hazard v. Israel,* 1 Binn. 239 (Pa.1808) (permitting punitive damages against Sheriff for misconduct of his

deputy in executing writ, in absence of actual damages).

Early in the course of Texas jurisprudence, this Court recognized that by awarding punitive as well as compensatory damages in certain cases the law "blends together the interests of society and the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender." *Graham v. Roder,* 5 Tex. 141, 149 (1849). Soon thereafter we noted that punitive damages also serve to deter future misconduct by setting "a public example to prevent the repetition of the act." *Cole v. Tucker,* 6 Tex. 266, 268 (1851). Our reliance on this remedy predated even the first relevant writing by the United States Supreme Court that

> [i]t is a well-established principle of the common law, that in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff.

*Day v. Woodworth,* 54 U.S. (13 How.) 363, 14 L.Ed. 181 (1851).

Sufficient importance was attached to punitive damages that they were accorded constitutional stature. *See* TEX. CONST. art. XII, § 30 (1869) (providing that one "commit[ting] a homicide through wilful act or omission, shall be responsible in exemplary damages").[9] While many new provisions added by this Convention[10] were later rejected as the misdeeds of Radical Republicans, this particular reform was embraced by the elected delegates of 1875. After debate and rewording,[11] the delegates adopted and the

---

9. Delegate F.W. Sumner's motion to strike this provision was defeated 40 to 29. 1 DEBATES OF THE RECONSTRUCTION CONVENTION OF 1868 756 (1870). As approved, it read:
 Every person, corporation or company, that may commit a homicide through wilful act or omission, shall be responsible in exemplary damages to the widow, heirs, legal representatives or creditors, of his or her body, or such of them as there may be, separately and consecutively, without regard to any criminal proceeding that may or may not be had in relation to the homicide.

10. *See Quinlan v. Houston & Tex. Central Ry.,* 89 Tex. 356, 34 S.W. 738, 744 (1896) (explaining

that, pursuant to a proclamation of U.S. President Andrew Johnson, this convention met to restore the Constitution of 1845 and disavow the 1861 Secession Convention); *see also Grigsby v. Peak,* 57 Tex. 142, 145, 150–51 (1882).

11. The Committee on General Provisions, chaired by Delegate C.S. West of Travis County, reported a proposed section identical to the 1869 Constitution, except for punctuation and the omission of the phrase, "separately and consecutively." JOURNAL OF THE 1875 CONSTITUTIONAL CONVENTION 557 (1875). The only further change made was on the motion of Delegate William H. Stewart of Galveston County to add "or gross neglect" after "omission." *Id.* at 701.

people of Texas ratified as part of our fundamental governing law the requirement that anyone "commit[ting] a homicide, through wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages." TEX. CONST. art. XVI, § 25. Texas is the only state in the nation with such a provision.

Later Texas jurisprudence continued to emphasize that punitive damages serve essential deterrent and retributive functions:

> As a punishment, exemplary damages are designated not only as a satisfaction to the injured person, but likewise as a punishment for the guilty, to deter from any such proceeding in the future, and as a proof of the detestation of the jury to the act itself. The theory of exemplary, punitive, or vindictive damages ... involves a blending of the interests of society in general with those of the aggrieved individual in particular.

*Foster v. Bourgeois*, 253 S.W. 880, 885 (Tex. Civ.App.1923), *aff'd*, 113 Tex. 489, 259 S.W. 917 (1924).[12]

### III.

Rewriting history to characterize our civil courts solely as forums for compensation, the majority objects to punitive damages as "overcompensation"—a true "windfall." 879 S.W.2d at 18. But punitive damages have always served a broader function than that of compensation. *See, e.g., Linthicum v. Nationwide Ins. Co.*, 150 Ariz. 326, 723 P.2d 675, 679 (1986) (en banc) (besides punishing the wrongdoer and deterring similar conduct, punitive damages serve the purpose of "preserving the peace, inducing private law enforcement, compensating victims for otherwise unrecoverable losses, and financing the costs of litigation"); DAN B. DOBBS, REMEDIES § 3.9 at 205 (1st ed. 1973) (availability of punitive damages encourages civil plaintiffs to act as private attorneys general).

Similarly, in complaining of "overdeterrence," 879 S.W.2d at 18, the majority can only mean that abuse of policyholders by

insurers, as well as other abuse of ordinary citizens by the powerful, has been so curtailed that our existing level of deterrence can be reduced by eliminating this one important element. *But see Leigh v. Engle*, 858 F.2d 361, 368 (7th Cir.1988) (recognizing that "there is no way to overdeter" failure by fiduciary to attempt to perform fiduciary duties). Indeed, "overdeterrence" is an unusual new term that has appeared previously neither in Texas jurisprudence nor in ordinary dictionaries; rather it seems to be a recent invention of the law and economics school. Perhaps the majority subscribes to that perspective, which maintains that compensatory tort law should not prevent wrongly caused injuries, but rather encourage misconduct to the extent that its economic benefit outweighs its cost. RICHARD A. POSNER, ECONOMIC ANALYSIS OF THE LAW 147–52, 176–77 191–95 (3rd ed. 1986). The function of the tort system based on a negligence standard is said to be merely the "deterrence of *inefficient* accidents." *Id.* at 187 (emphasis added).

To the extent that punitive damages are obtainable, courts "implicitly reject the economic view that the optimal level of violations is greater than zero." DOUGLAS LAYCOCK, REMEDIES 607, 612 (1985) (citing *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981) (upholding $125 million punitive damage award on grounds that defendant exposed individuals to extreme risk after calculating that it would be more profitable to let the accidents happen and pay compensatory damages, than to spend the money necessary to prevent the accidents); and *Brown v. Missouri, Pac. R.R.*, 703 F.2d 1050 (8th Cir.1983) (same)). *See also Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 451 (1980) ("[Were it not for punitive damages,] some may think it cheaper to pay damages or a forfeiture than to change a business practice."); *Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 47 (Alaska 1979) ("threat of punitive damages serves a deterrence function in cases ... in which it would

---

12. *See also Lunsford v. Morris*, 746 S.W.2d 471, 471–72 (Tex.1988); *Hofer v. Lavender*, 679 S.W.2d 470, 474–75 (Tex.1984); *Pace v. State*, 650 S.W.2d 64, 65 (Tex.1983); *Pan Am. Petroleum Corp. v. Hardy*, 370 S.W.2d 904, 908 (Tex.Civ. App.—Waco 1963, writ ref'd n.r.e.); *Burlington–Rock Island R.R. v. Newsom*, 239 S.W.2d 734, 737 (Tex.Civ.App.—Waco 1951, no writ); *Schutz v. Morris*, 201 S.W.2d 144, 147 (Tex.Civ.App.—Austin 1947, no writ).

be cheaper for the manufacturer to pay compensatory damages to those who did present claims than it would be to remedy the product's defect"); *Haslip*, 499 U.S. at 20–22, 111 S.Ct. at 1045 (listing "the degree of reprehensibility" and "profitability" of misconduct as factors for "determining whether a punitive award is reasonably related to the goals of deterrence and retribution").

## IV.

That Transportation did not timely challenge its liability for bad faith insurance practices [13] does not slow the majority in the least from pontificating on this subject. This is part of a pattern now prevalent here of adjusting the law to fit the majority's social preferences without regard to whether a litigant has properly sought relief. *See General Motors v. Saenz*, 873 S.W.2d 353, 364 (1993) (Doggett, J., dissenting).

Broadly characterizing *Lyons v. Millers Casualty Ins. Co.*, 866 S.W.2d 597 (Tex.1993), the majority now insists that there can be "no evidence" of bad faith when "the jury . . . decides the insurer was simply incorrect about the factual basis for its denial of the claim" or a "simple disagreement among experts" occurs over coverage. 879 S.W.2d at 18. At best these rules beg the important questions appellate courts are charged with answering. The evidence is often contradictory as to whether the insurer was "simply wrong." When finding a breach of the duty of good faith and fair dealing in response to a properly submitted charge, a jury seldom indicates that it "decid[ed] the insurer was simply wrong." Nor are disagreements among experts usually "simple." These new rules have only served to promote unconstitutional factfinding by giving credence to expert opinion that the majority preferred, but which the jury could easily have found entirely incredible, *Lyons*, 866 S.W.2d at 604–05 (Doggett, J., dissenting), and by categorically limiting solely to coverage, evidence that the jury could have interpreted as implicating both coverage and bad faith. *Id.* at 603–04; *Dominguez*, 873 S.W.2d at 378 (Doggett, J., dissenting). As further authority for its new approach, the majority glibly asserts that "a brick is not a wall." 879 S.W.2d 25. Conducting a whole new mode of review based on this short aphorism, however, the majority is likely to use it as a sledgehammer, reducing to piles of rubble the factfinding edifices which the Constitution and a complex set of procedures carefully entrust juries to assemble.

Even more remarkably, considering that bad faith liability is not at issue here, the majority additionally appears to make its first embrace of the so-called bona fide dispute rule. 879 S.W.2d at 25 (citing *National Union Fire Ins. v. Hudson Energy Co.*, 780 S.W.2d 417 (Tex.App.—Texarkana 1989), *aff'd on other grounds*,[14] 811 S.W.2d 552 (Tex.1991)). As applied in *Hudson*, this rule appears rather narrow: an insurer's failure to pay can evidence malice and, if arbitrary and capricious, gross negligence, absent a bona fide controversy over coverage; "but such a dispute cannot be created by "a strained and unconscionable interpretation of policy coverage." 780 S.W.2d at 427. Such a rule is not, however, well-suited for the narrow type of review permitted this Court by the Texas Constitution.[15] By having this

---

**13.** Only within this month, more than a year after it filed its application for writ of error, did Transportation seek to amend its application to challenge its liability on the bad faith claim. This motion was properly denied.

**14.** *Hudson Energy* involved the reversal by the court of appeals of a bad faith judgment on no evidence grounds based at least in part on the plaintiff's own testimony that the claims adjustor had not unreasonably delayed the claim. 780 S.W.2d at 426–27. Since the policyholder never appealed this part of the judgment, we never considered, much less "affirmed," the court of appeals' analysis of the bad faith claim.

**15.** *See Wilson v. Wilson*, 145 Tex. 607, 201 S.W.2d 226, 227 (1947) ("[The] Supreme Court is not invested with the power to determine facts."); *Choate v. San Antonio & A.P. Ry.*, 91 Tex. 406, 44 S.W. 69, 69 (1898) (Constitution restricts this Court to questions of law). As we said in *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.1993),

In reviewing a "no evidence" point, this Court "must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences." *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *State v. $11,-*

Court determine whether the coverage dispute is truly bona fide, the majority promotes yet another mechanism for our unconstitutionally engaging in factfinding.[16]

This rule was appropriately subjected to severe criticism in *Nationwide Mutual Ins. Co. v. Crowe*, 857 S.W.2d 644, 649 n. 1 (Tex. App.—Houston [14th Dist.] 1993, writ denied), since some categories of insurance claims almost always will give rise to coverage controversies. Such a dispute may well develop without bad faith, but it is also conceivable that delay, even by an insurer with an otherwise legitimate dispute, may constitute bad faith. A central tenet of our decisional law is that claims for insurance contract coverage are distinct from those in tort for bad faith; resolution of one does not determine the other. *Aranda v. Insurance Co. of North America*, 748 S.W.2d 210, 214 (Tex.1988). The nature of a policyholder's breach of contract claim against the insurance company "is not controlling as to the question of breach of the duty of good faith and fair dealing." *Viles v. Security Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex.1990). Certainly an insurer who willfully fails to investigate a claim, and delays and denies coverage with no reasonable basis, should not be freed from responsibility for its misconduct simply because it belatedly uncovers a contractual defense.

By adopting the ambiguous bona fide dispute rule, the majority may be enabling insurers to defeat bad faith claims merely by bringing a challenge to coverage. Today's opinion offers a perverse incentive for insurers to manufacture or accentuate coverage disputes and further delay payment of claims.

## V.

## A.

For the very few types of bad faith claims which can henceforth be established, the majority now seeks to bar recovery for punitive damages. Citing only foreign authorities, today's opinion imposes an unusual rule with absolutely no basis in Texas law that punitive damages are recoverable only when the injury risked by the insurer's misconduct is "independent and qualitatively different from the sort of injuries that typically result from bad faith or breach of contract."[17] 879 S.W.2d at 24. This declaration that the injury for punitive damages purposes must be different from that recoverable for bad faith breach of contract apparently represents a notorious first in our national jurisprudence.[18] Of course, no Texas authority exists for the bold new claim that

> an insurance carrier's refusal to pay a claim cannot justify punishment unless the insurer was actually aware that its action would probably result in extraordinary harm not ordinarily associated with breach of contract or bad faith denial of a claim.

879 S.W.2d at 25. Rather this simply constitutes a new edict that punitive damages liability is hereby eliminated for virtually all insurance company conduct—no matter how

---

014.00, 820 S.W.2d 783 (Tex.1991); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965).

16. The majority, discussing appellate review of punitive damage awards, laments the constitutional limitations on its ability to review and reverse jury findings. 879 S.W.2d at 28–29.

17. Neither Texas case cited by the majority is relevant. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986), stands only for the well-accepted proposition that exemplary damages cannot be recovered in the absence of a tort. In *Ware v. Paxton*, 359 S.W.2d 897, 899 (Tex. 1962), the type of conduct of the defendant, not the nature of the injury to the plaintiffs, was the reason for rejecting such damages.

18. At best, two of the nine foreign cases cited, 879 S.W.2d at 19, *Shimola v. Nationwide Ins. Co.*, 25 Ohio St.3d 84, 495 N.E.2d 391, 392 n. 1, 393 (1986) and *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 652 P.2d 665, 668 (1982), merely hold that punitive damages are not recoverable on a contract claim; neither involved viable tort claims. *See also Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79, 89 (1990) (Kansas does not recognize the tort of breach of duty of good faith and fair dealing).

In a not too subtle manner, the majority seeks to incorporate into Texas law the law of other jurisdictions that refuse entirely to subject insurers to any liability for bad faith torts. *See* 879 S.W.2d at 19, n. 9.

morally reprehensible and intentionally harmful.[19]

A one-dimensional definition of "extraordinary harm" or "extreme degree of risk" can be easily employed to insulate those responsible for outrageous conduct:

[T]his majority can simply squelch by branding as "non extreme" any legitimate evidence that stands in the way of a preferred outcome. Such use of the word "extreme" merely provides another elastic device for an appellate court to sweep away any evidence inconsistent with the result it wants.

To the extent that what makes a risk "extreme" is a function of any thing other than a judicially desired result, the sole determinant appears to be the probability that harm will occur. [T]his is only one determinant of the "extremity" of a risk; equally important is the character of the wrongful conduct involved. Punitive damages should be tied to the outrageousness of that conduct.

*Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d at 334 (Tex.1993) (Doggett, J., dissenting). This focus solely on the degree of harm to a particular individual conflicts with the principle underlying punitive damages, which views the harm as directed to the individual as a part of society at large. Angela P. Harris, *Rereading Punitive Damages: Beyond the Public/Private Distinction*, 40 ALA.L.REV. 1079, 1107 (1989). The more outrageous misconduct seems to a group of twelve ordinary citizens representing the collective voice of the community, the greater are society's interests in deterrence and punishment. *See also* Michael Rustad, *In Defense of Punitive Damages in Products Liability: Testing Tort Anecdotes with Empirical Data*, 78 IOWA L.REV. 1, 88 (1992) [hereinafter *Punitive Damages* ].

This case illustrates the arbitrary use to which the majority can put this new emphasis on separate individualized injury, distinct from that associated with bad faith and breach of contract injuries. Juan Moriel's distress was neither ordinary nor insignificant. He, in the words of the court of appeals,

receiv[ed] an injury that affected an intimate and personal part of his life. He was sued. He resorted to heavy drinking and his marriage was jeopardized.

814 S.W.2d at 150. Substituting a rarified view perceived from the top of the Supreme Court building in Austin for the moral outrage of the jury in El Paso County, the majority patronizingly labels "genuine", but not worth deterring, Moriel's fear and trauma of struggling with the resistant Transportation Insurance Company to obtain the means to recover his full masculinity.

### B.

Still not satisfied that it has sufficiently insulated insurers from responsibility to their policyholders, the majority deliberately misconstrues *Williams v. Steves Industries*, 699 S.W.2d 570, 573 (Tex.1985), in a way that effectively reverses the definition and proof of gross negligence contained in this widely applied precedent. What the majority cites as a "suggestion" of *Williams*, 879 S.W.2d at 20, n. 11, is in fact its holding; *Williams* identifies alternative objective and subjective tests for establishing the requisite mental state for gross negligence:

We held in *Burk Royalty* that the defendant's state of mind distinguishes gross negligence from negligence; however, we also recognized that a test requiring the plaintiff to prove gross negligence by direct evidence of a defendant's subjective state of mind would leave outrageous conduct unpunished. Therefore, we held that "[a] mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in

---

**19.** This ruling also conflicts with the well-established law in most jurisdictions recognizing the bad faith tort, which allow punitive damages where an insurer willfully or recklessly withholds policy benefits, without requiring that the insured suffer extensive consequential damages. *See, e.g., Continental Assurance Co. v. Kountz*, 461 So.2d 802, 809 (Ala.1984); *Hawkins v. All-state Ins. Co.*, 152 Ariz. 490, 733 P.2d 1073, 1079–80 (1987); *Employers Equitable Life Ins. Co. v. Williams*, 282 Ark. 29, 665 S.W.2d 873, 873–74 (1984); *Hagel v. Blue Cross and Blue Shield of North Carolina*, 91 N.C.App. 58, 370 S.E.2d 695, 699 (1988); *Berry v. Nationwide Mut. Fire Ins. Co.*, 181 W.Va. 168, 381 S.E.2d 367, 374 (1989).

deciding if there is some evidence of gross negligence." *Burk Royalty,* 616 S.W.2d at 922. We reaffirm our holding in *Burk Royalty* that the plaintiff need not prove the defendant's subjective state of mind by direct evidence.

Thus, the test for gross negligence is both an objective and subjective test. A plaintiff may prove a defendant's gross negligence by proving that the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. In addition, a plaintiff may objectively prove a defendant's gross negligence by proving *that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.*

699 S.W.2d at 573 (emphasis added).[20]

The majority today decides to extirpate this passage not by expressly overruling *Williams,* but by characterizing its clear and unmistakable language as "misleading."[21] 879 S.W.2d at 22. Up until now, neither we nor any of the other state or federal courts that have had occasion to interpret *Williams* have found anything misleading about this language. In *Clifton v. Southern Pacific Transp. Co.,* 709 S.W.2d 636, 640 (Tex.1986), we reiterated that

[r]equiring the plaintiff to prove gross negligence only by direct evidence of a defendant's subjective state of mind ... raises an almost insurmountable barrier to recovery. Recognizing this dilemma, we held in *Burk Royalty* that a mental state may be inferred from actions. Considering all ac-

tions or circumstances indicating a state of mind amounting to conscious indifference to the rights of others, a plaintiff may objectively prove a defendant's gross negligence by proving that, under the surrounding circumstances, a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.

(citations omitted). This too has been the consistent reading of *Williams* by every Texas court of appeals that has had occasion to interpret it.

The federal courts have similarly recognized that

Texas courts have made clear that the state of mind required to constitute gross negligence can be shown by objective evidence ... proving that, under the circumstances, a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others.

*Denham v. United States,* 834 F.2d 518, 522 (5th Cir.1987); *see also Toomer v. United Resin Adhesives, Inc.,* 652 F.Supp. 219, 225–26 (N.D.Ill.1986) (Texas law allows proof of "defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others").

All of these rulings say the opposite of what the majority now adopts as new state law. No longer can common law gross negligence be established by evidence of circumstances which would have shown an aware-

---

**20.** It is particularly disingenuous for the majority to refer to this holding as a "suggestion," while relying on commentary quoting this very passage as an important holding. *See* John T. Montford & Will G. Barber, *1987 Texas Tort Reform: the Quest for a Fairer and More Predictable Texas Civil Justice System* (pt. 2), 25 Hous.L.Rev. 245, 324 (1988).

**21.** As in *Alexander,* 868 S.W.2d at 325–26, the majority plays word games with the terms "objective" and "subjective" to obfuscate the clear language of *Williams.* There are two components to gross negligence: (1) the mental state of the defendant and (2) the degree to which his conduct puts the plaintiff at risk. As the numerous authorities cited above explain, the subjective

and objective tests identified in *Williams* are both used to determine whether the defendant possessed the requisite mental component, i.e. conscious indifference. The majority does not use the words "subjective" and "objective" in this way, however, perhaps because it denies that *Williams* even permitted an objective test for conscious indifference. The majority now confusingly chooses to refer to the entire first component, the mental state, as the "subjective" component of gross negligence. 879 S.W.2d at 21; *Alexander,* 868 S.W.2d at 326. The term "objective" no longer refers to one test for the defendant's mental state; but rather to the second component of gross negligence, the extreme degree of risk. 879 S.W.2d at 21; *Alexander,* 868 S.W.2d at 326.

ness of an extreme risk by a reasonable person.[22]

*Williams'* articulation of an objective standard of mental culpability was solidly rooted in this Court's past precedent. In *Brooke v. Clark*, 57 Tex. 105, 106 (1882), for example, punitive damages were awarded against a physician who, during the birth of the plaintiff, tied "a ligature around [the plaintiff's] penis, instead of the umbilical cord, ... whereby the glands of the penis came entirely off." Even though no evidence of the physician's actual mental state was introduced to prove conscious indifference,[23] the jury verdict was upheld:

> The criminal indifference of the defendant to results was a fact which the jury were at liberty to infer from the gross mistake which he either made or permitted to be made, and the grievous injury which was liable to result and did result therefrom. If there was any other evidence tending to negative any wrong intent or actual indifference on his part, still the existence or non-existence of such criminal indifference was a question of fact for the jury, and was rightly submitted to them. If the conduct of the defendant in the discharge of his duty ... was so grossly negligent as to raise the presumption of his criminal indifference as to results, we very greatly doubt whether it should avail to exempt him from exemplary damages, for him to show that he had no bad motive, and that he acted otherwise in a manner tending to show that he was not, at heart, indifferent.

22. Although this is not a case in which the new statutory definition of gross negligence applies, *see infra*, note 32, and accompanying text, the majority suggests that its new common law definition of gross negligence should be used in all cases, even those subject to the Tort Reform Act. 879 S.W.2d at 21. Although in this dictum the majority takes the position that the legislature has eliminated *Williams'* objective test for determining actual conscious indifference, the majority also asserts that the "Tort Reform Act codified the common law definition and made no changes affecting the basic elements of gross negligence." 879 S.W.2d at 20. The Senate floor debate on the statute in question reveals no mention of either *Williams* or any desire to alter the objective method of proving conscious indifference. To the contrary, the legislative sponsor, Senator John Montford, suggested that gross negligence could encompass highly risky acts of ordinary negligence which result from mistaken, rather than knowledgeable, behavior. *See* Debate on Tex. S.B. 287 on the Floor of the Senate, 70th Leg. 3–9 (May 6, 1987) (transcript of tapes available from Senate Staff Services Office). Senator Montford further explained that the statutory definition encompasses conduct that falls between criminal conduct and ordinary negligence. *Id.* In other words, the requirements for a culpable mental state should be the least restrictive for ordinary negligence (i.e. no knowledge or intent required) and the most narrow for criminal negligence, while the new statutory civil gross negligence falls somewhere in the middle. Yet the statutory definition of criminal negligence incorporates an objective standard of knowledge like that set forth in *Williams*:

> A person acts with criminal negligence ... when he *ought to be aware* of a substantial and unjustifiable risk that the circumstances exist or the result will occur.

TEX.PEN.CODE § 6.03(d) (emphasis added). If one can be liable for criminal penalties for failing to be aware of a substantial and unjustifiable risk, then, as suggested by Senator Montford during debate, that same failure creates liability for punitive damages. The Tort Reform Act codified the objective test for conscious indifference found in the common law until today. For this reason, and because this case is not governed by the statutory definition of gross negligence, today's radical redefinition of common law gross negligence should not be controlling in future cases subject to the statutory definition.

Under most circumstances, it is such exchanges by the legislators while considering the enactment that offer an indication of legislative intent. *Compare General Chemical Corp. v. De La Lastra*, 852 S.W.2d 916, 923 (Tex.1993) (the post debate professed "intent of an individual legislator, even a statute's principal author, is not legislative history controlling the construction to be given a statute."); *C & H Nationwide, Inc. v. Thompson*, 37 Tex.Sup.Ct.J. 149, 165 (Nov. 24, 1993) (Doggett, J., concurring) (accepting legislative author's post debate description of legislative process because rather than being an "after-the-fact, self-serving [statement] of a single legislator or an attempt to embellish and expand language that the legislature did not approve, [it was] really the legislative equivalent of an admission against interest").

23. The testimony in this case shows that the defendant was skillful in his profession; that he seemed anxious to discharge his whole duty; desired to be sent for to adjust the ligature should it become detached; no reason or motive is shown why he should carelessly, much less willfully, have caused the injury; on the contrary, his own interest and reputation, to say nothing of the ordinary promptings of humanity to render aid and not to inflict injury under such circumstances, would seem conclusively to have prohibited intentional wrong. 57 Tex. at 117 (Bonner, J., dissenting).

57 Tex. at 113–14. *Brooke* and *Williams* are entirely consistent with fundamental principles of law obscured and denigrated by the majority, such as the important role of punitive damages in enforcing standards of conduct.[24]

In reversing *Williams,* however, the majority both redefines gross negligence to provide special protection to those who choose not to be aware of the consequences of their actions and creates a new evidentiary barrier to proving this restricted redefinition of gross negligence, thereby taking from juries the ability to pass community judgment on whole categories of wrongdoers. The majority seems eager to free those causing grievous injury to others from the obligation to reasonably think or perceive or to summon up even the most minimal awareness possessed by a reasonable person. Ultimately, today's writing holds that an insurance company can go unpunished unless the policyholder it victimized can prove not only unusual harm from the misconduct but also that the insurer knew or expected the unusual to happen.

Although I would not prejudge the trial court's articulation of the facts on remand, it is important to acknowledge that the majority has deliberately disregarded evidence of gross negligence contained in the record. According to Moriel, actual conscious indifference is shown by the testimony of Transportation's adjustor, who acknowledged the wrongfulness of an insurer in failing to pay submitted medical bills unless a controversion was filed with the Industrial Accident Board.[25] Yet Transportation failed to controvert any of four bills that it refused to pay until settlement. Payment of one of these was denied, and ultimately delayed more than two years after the request for treatment, even though Moriel had received permission for treatment from Transportation, after being sent back three times to three different physicians for referrals. Transportation's adjustor described her practice of sometimes consciously declining to notify an injured worker of the insurer's decision to deny payment. Because of her intentional decision not to respond to Moriel's request, he was forced to defend a collections suit. The adjustor admitted, moreover, that such delays could cause harm additional to that resulting from the work-related injury.

## VI.

### A.

Attacks on the concept of punitive damages are certainly not new. At about the time that Texas was enshrining this remedy in its fundamental governing law, another state's highest court decried punitive damages as "a monstrous heresy ... an unsightly and an unhealthy excrescence, deforming the symmetry of the body of the law." *Fay v. Parker,* 53 N.H. 342, 382 (1873). More recent opposition, while conceding that "[p]unitive damages may have served a valuable function in the scheme of ancient law," reveals the same philosophy, claiming that the "doctrine is monstrously archaic" and calling for its abolition or emasculation. James B. Sales & Kenneth B. Cole, Jr., *Punitive Damages: A Relic That Has Outlived Its Origin,* 37 VAND.L.REV. 1171, 1178 (1984).

If punitive damages cannot be formally eliminated, opponents urge mechanisms for their effective elimination, such as requiring that a jury find proof of gross negligence "beyond a reasonable doubt." *Id.* at 1167.[26]

24. [W]hen we are dealing with that part of the law which aims more directly than any other at establishing standards of conduct, we should expect there more than elsewhere to find that the tests of liability are external and independent of the degree of evil in the particular person's motives or intentions.
HOLMES, THE COMMON LAW at 43.

25. Apparently this bothered the adjustor more than it does the majority. Today's opinion specifically seems to offer insurers a complete excuse for engaging in this practice, which Transportation's own agent conceded to be wrong. 879 S.W.2d at 25 n. 18.

26. Though flirting with such heightened proof requirements, the majority finally decides that this Court should not impose as a prerequisite for punitive damages the same clear and convincing evidence standard that the Legislature has already rejected. *See* 879 S.W.2d 31. I certainly agree with this conclusion. Not only is such a standard "not constitutionally compelled," *id.,* it would also represent a total divergence from one of the most firmly established

To support such an abrupt change in our well recognized jurisprudence, these opponents point to most any case in which substantial punitive damages have been assessed. *See id.* at 1141 n. 117 (claiming that the need for change is exemplified by the verdict regarding the fiery deaths resulting from a conscious corporate decision to avoid safer gas tank design in *Grimshaw v. Ford Motor Co.,* 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (1981)); *Punitive Damages,* 78 Iowa L.Rev. at 21 (discussing opponents' claims as "theoretical and of the 'school of tort reform by anecdote' or 'isolated fact' "); Stephen Daniels and Joanne Martin, *Myth and Reality in Punitive Damages,* 75 Minn.L.Rev. 1, 14 (1990) (opponents use "horror stories and anecdotes" rather than hard data).

The incidence and amount of punitive damages may indicate a deficiency in our legal system or may be reflective of a community determination of a gross deficiency in conduct. Since punitive or exemplary damages often emanate from most nonexemplary conduct, in any fine tuning of the law, we must consider what degree of change is justified by the empirical data.

### B.

Available data demonstrates that punitive damages are actually assessed far more infrequently than critics suggest. After reviewing more than 25,000 civil jury verdicts from 1981–1985 in 47 counties in 11 states, the American Bar Foundation concluded that all four of the central propositions [27] upon which those attacking punitive damages rely are factually insupportable. *See* Daniels and Martin, 75 Minn.L.Rev. at 4. Less than five percent of all jury verdicts included findings of punitive damages. *Id.* at 32 (Table II). With the exception of five California counties, median [28] punitive damage awards in the various jurisdictions were all *below* $40,000. *Id.* at 42 (Table VI). The American Bar Foundation's conclusions are corroborated by the findings of a comprehensive survey of products liability verdicts between 1965 and 1990 that:

> [p]unitive damages are infrequently awarded and often scaled down in the post-trial period.... punitive damages awards in nonasbestos products liability cases decreased between 1986 and 1990.[29]

A similar survey of federal products liability verdicts from 1982–84 found that punitive damages were awarded and upheld on appeal in only three percent of the cases. *See* William M. Landes & Richard A. Posner, The Economic Structure of Tort Law 302–07 (1987).[30]

principles of our jurisprudence. Only in an extraordinary circumstance such as where we have been mandated to impose a more onerous burden has this Court abandoned the well established preponderance of the evidence standard. *See Addington v. Texas,* 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979). Not until remand did we adopt a "clear and convincing evidence" standard in civil commitment cases. *See State v. Addington,* 588 S.W.2d 569, 570 (Tex.1979); *see also In the Interest of G.M.,* 596 S.W.2d 846, 847 (Tex.1980) (relying on *Addington,* establishing that the clear and convincing evidence standard applies to the involuntary termination of parental rights).

27. "All other claims about the harmful effects of punitive damages presume the accuracy of [four] propositions": 1) punitive damages are routinely awarded; 2) they are awarded in large amounts; 3) the frequency and size of the awards has been rapidly increasing; and 4) these phenomena are national in scope. Daniels and Martin, 75 Minn. L.Rev. at 14.

28. Punitive damages critics consistently cite the mean, or average, amount of punitive verdicts as evidence that they are "skyrocketing," and avoid mentioning the median, or figure above which half of the verdicts fall. Daniels and Martin, 75 Minn.L.Rev. at 41. The median is much more representative whenever there are more extreme cases at one end of the distribution than the other. *Id.* at 40 (citing Hubert Blalock, Social Statistics 69–70 (rev. 2d ed. 1979)). Because there are a few very large punitive damages claims, the median verdict, which is not skewed by these exceptional cases, accords a more accurate representation of the pattern of verdicts as a whole.

29. Michael Rustad, Demystifying Punitive Damages In Products Liability Cases: A Survey Of A Quarter Century Of Trial Verdicts 38 (Roscoe Pound Foundation, 1991) [hereinafter Demystifying Punitive Damages].

30. *See also* Michael J. Saks, *Do We Really Know Anything About the Behavior of the Tort Litigation System—And Why Not?* 140 U.Pa.L.Rev. 1147, 1251 (1992) (concluding that a wide variety of data "are not consistent with the conclusion that jury awards [for punitive damages] have in general risen sharply"); J.O. Clements, Comment, *Limiting Punitive Damages: A Placebo for Amer-*

Those who oppose our longstanding reliance upon trial by jury automatically assume that a sizeable verdict indicates an inappropriate decision by the jury rather than by the wrongdoer. But recent research emphasizes that the possibility of punitive damages

> discourag[ed] firms from marketing dangerous products or failing to recall them. The vast majority of dangerous products have been recalled, modified and redesigned by their manufacturers ...

> The study's central finding is that bad products were made better or taken off the market. There is little evidence that good products were withdrawn unnecessarily by potential punitive damages exposure.

*Punitive Damages,* at 79–80. After identifying as examples twenty-one products that were either improved or recalled following punitive damages verdicts, *id.* at 81–82, the study concludes:

> Restricting this remedy reduces the incentives for safety and may tempt corporations to put profits ahead of the public interest. Eliminating punitive damages would have the effect of lowering safety standards. In the long run, the American emphasis on safety, backed by the social control of punitive damages, will produce the top quality products needed to compete in the international marketplace.

*Id.* at 85. Moreover, punitive damages verdicts in 355 products liability cases nationwide for the period from 1965–1990, *see* DEMYSTIFYING PUNITIVE DAMAGES, at 23, compare with an estimated 29,000 deaths and 33 million injuries annually that are associated with consumer products. U.S. Consumer Product Safety Commission, WHO WE ARE, WHAT WE DO 1 (1987). Given the increasing

size of the injury pool and myriad other potential contributing factors to changes in punitive damages verdicts,[31] the data for an abrupt, radical change is simply lacking.

## C.

So strong is the majority's desire to legislate concerning punitive damages that it misinterprets a statute, wholly inapplicable here, to provide a meaning contrary to both its plain wording and the underlying legislative intent. Since 1987 when the term "gross negligence" was removed from common law development for most types of tort actions and defined by legislative enactment, the role for our judiciary on this subject has been limited principally to statutory enforcement. Having been commenced before the effective date of this statute, September 2, 1987, Moriel's claim is one of a limited number of lawsuits still subject to the common law definition of gross negligence.[32] Not content to decide only one of a small and decreasing number of cases, the majority seeks to rewrite a statute, which is in no way applicable here:

> "Gross negligence" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights safety, or welfare of the person affected.

TEX.CIV.PRAC. & REM.CODE § 41.001(5) (Supp. 1994). That the word "extreme" never appears in this definition does not deter the frustrated legislators, who compose the current majority, from adopting an amendment to add an "extreme degree of risk" compo-

---

*ica's Ailing Competitiveness,* 24 ST. MARY'S L.J. 197, 212–15 (1992) (rebutting former Vice President Dan Quayle's contention that punitive damages are both "freakish" and "routine").

**31.** Even if the empirical data demonstrated an increase in the frequency and amount of punitive damages verdicts, more must be known:

> Any inference about whether the average size of awards or settlements has gone up, down, or remained level, in real terms, depends upon knowing what the pool of injuries looks like. If the pool of injuries has increased and the inherent seriousness of the injuries or the cost

of repairing them has increased, one should not be surprised to find a commensurate increase in cases or awards.

Saks, 140 U.PA.L.REV. at 1174.

**32.** This statutory definition of gross negligence may not apply to tort actions for bad faith. *Stephen Pate, Insurance Bad Faith: Defendant's Perspective, in* TEXAS TORTS IN THE 90's at C–10 (1992) ("It is an open question whether the exemplary damages limitation applies to a common law breach of the duty of good faith and fair dealing."). However, with the majority's recent rulings, there will now quite clearly be a small and decreasing category of bad faith cases.

nent. 879 S.W.2d at 23. To the extent that others may share the majority's enthusiasm for eliminating punitive damages, we have a forum in our democracy that can weigh such conflicting views and evaluate the empirical evidence in public hearings. The appropriate avenue for relief in Texas is not through the type of crude manipulation of the law that has occurred here but rather at the Legislature—the same place to which the "tort reformers" turned in 1987.[33]

## VII.

Punitive damages have played a necessary role in preserving the public health and safety and societal confidence in law enforcement. In today's complex technological world that role retains continuing significance. By penalizing those who consciously disregard others' rights, punitive damages provide important incentives for the implementation of critical safety measures. At the same time, by holding accountable those actors whose behavior society considers most outrageous, such damages reinforce the boundaries of acceptable conduct and thereby instill greater public trust.

None of this, however, means our system is perfect—undoubtedly some defendants are improperly punished just as some wrongdoers are unjustly assessed no punitive damages. Thus, I favor improving our existing approach rather than abandoning it. Today I would have joined in an attempt to make that system more fair to the wrongdoer, but I must dissent vigorously from today's decision to engage in unprecedented wholesale revision of the law of our state in order to protect the insurance industry from the judgment of the community.[34] A judge's desire to further a social policy objective has unfortunately once again overcome sound jurisprudence.

**33.** As two scholars point out,

> The debate [regarding punitive damages] changed in the 1980's as part of an intense, well-organized, and well-financed political campaign by interest groups seeking fundamental reforms in the civil justice system benefiting themselves.

Stephen Daniels and Joanne Martin, *Myth and Reality in Punitive Damages*, 75 MINN.L.REV. 1, 10 (1990). In fact, "[s]ince the mid-1980's, a majority of states have enacted tort reforms curbing punitive damages." *Punitive Damages*, 78 IOWA L.REV. at 6. The Texas debate played itself out in the fight over passage of the 1987 tort reform package, which has been well documented. Senator John Montford's sponsorship of broad "tort reform" legislation advanced by the insurance industry and other lobby groups operating under the title "Texas Civil Justice League" is described in John T. Montford & Will G. Barber, *1987*

*Texas Tort Reform: the Quest for a Fairer and More Predictable Texas Civil Justice System* (pts. 1-2), 25 HOUS.L.REV. 59, 245, 324 (1988). That battle resulted in, among other things, a statutory cap on punitive damages to the greater of four times compensatory damages or $200,000. TEX. CIV.PRAC. & REM.CODE § 41.007 (1988). The constitutionality of that limitation is not at issue here.

**34.** Today's writing does, of course, represent more than a special favor to the insurance industry; it is equally applicable to any wrongdoer, including those who continue to manufacture dangerous products. 879 S.W.2d at 25-26. The majority has concluded generally that the deterrence of wrongful conduct offered by punitive damages is unnecessary because just "the prospect of being sued and having to defend oneself have a substantive deterrent effect" and compensatory damages are a quite sufficiently "powerful deterrent." *Id.* n. 21.